ATKINSON *v.* JOHN E. DOHERTY & CO.

EQUITY—INJUNCTION—CIGAR LABEL—PRIVATE NAME AND LIKE-
NESS.

>   Equity will not restrain the use of the name and likeness of a
>   deceased person as a label for a brand of cigars named after
>   him, though offensive to the family of the deceased, so long
>   as it does not amount to a libel.

Appeal from Wayne; Donovan, J.   Submitted May 10,
1899.   Decided September 27, 1899.

Bill by Lyda Atkinson against John E. Doherty &
Company, a corporation, to restrain the use for advertising
purposes of the name and likeness of her deceased hus-
band.   From a decree dismissing the bill, complainant
appeals.   Affirmed.

*Elliott G. Stevenson* and *Leo M. Butzel* (*O'Brien J.
Atkinson,* of counsel ), for complainant.

*James H. Pound* (*Ward N. Choate* and *James
Phelan,* of counsel ), for defendant.

HOOKER, J.   The late Col. John Atkinson was a well-
known lawyer and politician.   After his death, the de-
fendant, a manufacturer of cigars, brought out an article
that it named the John Atkinson cigar, and sought to put
it upon the market under a label bearing that name and
a likeness of Col. John Atkinson.   The widow of Col.
Atkinson filed a bill to restrain this, and upon the hearing
the circuit court made a decree dismissing the bill with
costs, and the complainant has appealed.

As a rule, names are received at the hands of parents,
—surnames by inheritance, and Christian names at their
will.   But this is not an invariable rule, for many names
are adopted or assumed by those who bear them.   But in

neither case is the right to the use of a name exclusive.
A disreputable person or criminal may select the name of
the most exemplary for his child, or for his horse or dog
or monkey.   We have never heard this questioned.   No
reason occurs to us for limiting the right to apply a name,
though borne by another person, to animate objects.
Why not a John Atkinson wagon, as well as a John
Atkinson Jones or horse or dog ?   Society understands
this, and may be depended upon to make proper allow-
ances in such cases; and although each individual mem-
ber may, in his own case, suffer a feeling of humiliation
when his own name or that of some beloved or respected
friend is thus used, he will usually, in the case of another,
regard it as a trifle.    We feel sure that society would
not think the less of Col. John Atkinson if cigars bearing
his name were sold in the shops.   Nor are his friends
brought into disrepute thereby.   So long as such use does
not amount to a libel, we are of the opinion that Col. John
Atkinson would himself be remediless, were he alive, and
the same is true of his friends who survive.

It is urged in this case that the connection of the name
with cigars wounds the feelings of the widow, and extreme
and improbable illustrations of the possibilities of a rule
which should permit the indiscriminate use of names of
deceased persons are given.   We appreciate the indelicacy
of the man who should join the funeral procession of Col.
John Atkinson in a carriage bearing the legend, " The
Col. John Atkinson cigar," and we can readily understand
that it would annoy the friends of the deceased.   The
sentiment which prompts the feeling of annoyance at such
an act is aroused by any aspersion of the dead.   It is
natural and commendable, as are all recognitions of the
proprieties of life; but it does not follow that such an act
is an actionable wrong, or that equity will intervene by
injunction to prevent it, though we are quite sure that the
disapproval of society would ordinarily have the latter
effect.

Stress is laid upon the fact that the picture of Col. John

Atkinson is to be displayed upon this label.    It is claimed that a man has no right to print and circulate pictures of another, except by his consent, or where, by reason of his celebrity, the public has an interest in him.    This is a proposition of modern origin, and is said to have the support of some cases.    We will examine the authorities that have been cited, and such as we have been able to find.

In the January, 1869, Law Register (volume 8, N. S. p. 1), is an article devoted to a discussion of "The Legal Relations of Photographs," in which the writer expresses the opinion that if a photograph clandestinely taken, and representing its original in a ridiculous light, or publishing his personal defects, were uttered maliciously, to his damage, it would doubtless be a libel in all of the States, and particularly in those in which the old maxim, "The greater the truth, the greater the libel," is still in force. That it would be a libel, if a true picture, in States where the truth may be shown in defense, is not so clear as it may seem; but there is no want of harmony in the decisions upon the proposition that a picture may be libelous. The author mentions the case of an Austrian lady of rank who recovered damages from her photographer for selling copies of her photograph as that of some notorious woman in another city.    He says, "What was the ground or the nature and extent of recovery we are not told;" and adds that, if no special damage were found, it could not be doubted that "her right to control the market of her own beauty could not have been denied her by any court, and that she must have recovered on the ground that that right had been infringed, if on no other."    We are at a loss to know just what is meant by this.    If only that, having produced or caused to be produced a negative and photograph of herself, it was, like private writings, entitled to protection, it has the semblance of support by a number of cases.    But if it is meant that no person has, without permission, the right to have or sell pictures of another, it is a different proposition, and we know of no case decided by a court of last resort that so holds.

In 1890 prominence was given to this subject by an article in 4 Harv. Law Rev. 193, entitled, "The Right to Privacy," in which the writers urge the "right to be let alone," and the necessity for the protection of citizens against invasions of their domestic affairs through the newspaper, the camera, and numerous mechanical devices, "which [they say] threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the housetops.'" The right to privacy in a broader sense than before known to the common law is asserted. The article cites a number of cases, some of them relating to pictures, and criticises the courts for basing their decisions upon property or contract rights. These cases relate to letters, diaries, and other private writings, paintings, sculptures, music, etc. In this connection the case of *Prince Albert* v. *Strange*, 1 Macn. & G. 25, is cited, wherein the defendant was restrained from publishing some etchings made by their majesties, the king and queen. The burden of the article is to establish a right of privacy which shall be recognized and protected by the courts, and it is urged that "in such right, as in the right not to be assaulted or beaten (*i. e.*, the right to be let alone)," there inheres the quality of being owned or possessed; and, as that is the distinguishing attribute of property, there may be some propriety in speaking of those rights as property, though it is admitted that they bear little resemblance to what is ordinarily comprehended under that term. Notwithstanding the unanimity of the courts in resting the decisions adverted to upon property rights, the authors assert that "it is in reality not the principle of private property, but that of an inviolate personality."

An examination of the article will show that authoritative decisions which support the theory advocated are wanting. Among them are several cases involving pictures: *Prince Albert* v. *Strange, supra; Tuck* v. *Priester*, L. R. 19 Q. B. Div. 629; *Pollard* v. *Photographic Co.*, L. R. 40 Ch. Div. 345. But these are

based upon property or contract rights, as these terms are commonly understood. At the time of the writing of this article, the case of *Manola* v. *Stevens* was pending in a court at New York. An actress sought to restrain the publication of a picture of herself, taken surreptitiously while she was performing her role upon the stage. It was not contested, however, and we are not advised that it was reported. See New York Times of June 15, 18, 21, 1890. The *Manola Case*, and the article in the Harvard Law Review, were soon followed by another case. In June, 1892, the case of *Schuyler* v. *Curtis*, 64 Hun, 594, involving a preliminary injunction only, was decided in the First department of the supreme court of New York, affirming the decision of the district court, reported in 27 Abb. New Cas. 387. An unincorporated society, connected with which was Miss Susan B. Anthony, arranged to place a life-size statue of Mrs. G. L. Schuyler, to be designated "The Typical Philanthropist," upon exhibition at the World's Fair, soon thereafter to be held in Chicago. This was enjoined by her relatives, and upon a motion an opinion was written that goes the length for which the complainant's counsel in this case contend. *Schuyler* v. *Curtis, supra*. The case was afterwards heard, and a decree in accordance with the prayer of the bill entered. See *Schuyler* v. *Curtis*, 30 Abb. New Cas. 376.

Meantime the case of *Marks* v. *Jaffa* arose. This also was a New York case, and is reported in 26 N. Y. Supp. 908. The defendant devised the scheme of publishing in his newspaper a picture of two actors, with an invitation to the readers of the newspaper to vote, with a view to determining who was the more popular of the two. The complainant declined to consent, yet a publication was made, when the bill was filed to restrain it. The injunction was granted, apparently on the strength of *Schuyler* v. *Curtis*.

Another case arose before the final disposition of the *Schuyler Case*, viz., *Corliss* v. *Walker*, 57 Fed. 434. It

was a bill filed in the federal circuit court of Massachusetts by the widow and children of Mr. Corliss, celebrated as the builder of the great engine exhibited at the Centennial Exposition held at Philadelphia, to restrain the publication of a biography and picture of himself. It was based distinctly upon the ground taken in the article published in the Harvard Law Review, viz., that it was an invasion of the right of privacy, and it was insisted that a court of equity should protect such right. Apparently the case of *Schuyler* v. *Curtis*, 27 Abb. New Cas. 387, was relied upon, for in the opinion it was said to be not in point, as it did not involve a publication. The court said, among other interesting things, that:

"In the first place, I cannot assent to the proposition that Mr. Corliss was a private character. He held himself out to the public as an inventor, and his reputation became world-wide. He was a public man, in the same sense as authors or artists are public men. It would be a remarkable exception to the liberty of the press if the lives of great inventors could not be given to the public without their own consent while living, or the approval of their family when dead. But whether Mr. Corliss is to be regarded as a private or public character (a distinction often difficult to define) is not important in this case. Freedom of speech and of the press is secured by the Constitution of the United States and the constitutions of most of the States. This constitutional privilege implies a right to freely utter and publish whatever the citizen may please, and to be protected from any responsibility for so doing, except so far as such publication, by reason of its blasphemy, obscenity, or scandalous character, may be a public offense, or by its falsehood and malice may injuriously affect the standing, reputation, or pecuniary interests of individuals. Cooley, Const. Lim. (6th Ed.) 518. In other words, under our laws one can speak and publish what he desires, provided he commits no offense against public morals or private reputation.     *     *     *
"There is another objection which meets us at the threshold of this case. The subject-matter of the jurisdiction of a court of equity is civil property, and injury to property, whether actual or prospective, is the foundation on which its jurisdiction rests. *In re Sawyer*, 124 U. S. 200,

210; Kerr, Inj. (2d Ed.) 1. It follows from this principle that a court of equity has no power to restrain a libelous publication. *Boston Diatite Co.* v. *Florence Manfg. Co.*, 114 Mass. 69 (19 Am. Rep. 310); *Brandreth* v. *Lance*, 8 Paige, 24 (34 Am. Dec. 368). The opinion of Vice Chancellor Malins in *Dixon* v. *Holden*, L. R. 7 Eq. 488, to the contrary, is disapproved by Lord Chancellor Cairns in *Prudential Assurance Co.* v. *Knott*, 10 Ch. App. 142. In *Kidd* v. *Horry*, 28 Fed. 773, Mr. Justice Bradley, in speaking of *Dixon* v. *Holden* and several recent English cases, declares that they depend upon certain acts of parliament, and not on the general principle of equity jurisprudence.     *     *     *

"As to the picture which accompanies the published sketch, the case stands on a different footing. The defendants obtained from the plaintiffs a copy of a portrait and a photograph of Mr. Corliss, from which they have made two plates, one of which they propose to insert in the publication. But it appears from the evidence that these pictures were obtained on certain conditions, which the defendants have not complied with. This matter directly concerns the exclusive right of property which the plaintiffs have in the painting and photograph, and it would be a violation of confidence, or a breach of contract between the parties, to permit the defendants, under these circumstances, to use either of the plates. *Pollard* v. *Photographic Co.*, L. R. 40 Ch. Div. 345; *Prince Albert* v. *Strange*, 1 Macn. & G. 25. The injunction is denied as to the publication, and granted as to the use of the plates."

Subsequently a motion to dissolve the injunction was granted upon the ground that the deceased was a public character, and the public entitled to use his picture. Colt, J., said:

"Independently of the question of contract, I believe the law to be that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right; and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting, or the publication of private letters, or of oral lectures delivered by a teacher to his class, or the revelation of the contents of a merchant's books by a clerk. *Duke of Queensberry* v. *Shebbeare*, 2 Eden, 329; *Gee* v. *Pritchard*, 2 Swanst.

402; *Folsom* v. *Marsh*, 2 Story, 100; *Abernethy* v. *Hutchinson*, 3 Law J. Ch. (O. S.) 209; *Caird* v. *Sime*, 12 App. Cas. 326; *Tipping* v. *Clarke*, 2 Hare, 383, 393; *Williams* v. *Assurance Co.*, 23 Beav. 338. In the case of *Prince Albert* v. *Strange*, 1 Macn. & G. 25, 2 De Gex & S. 652, this doctrine was extended so far as to prohibit the publication of a catalogue of private etchings. But, while the right of a private individual to prohibit the reproduction of his picture or photograph should be recognized and enforced, this right may be surrendered or dedicated to the public by the act of the individual, just the same as a private manuscript, book, or painting becomes (when not protected by copyright) public property by the act of publication. The distinction in the case of a picture or photograph lies, it seems to me, between public and private characters. A private individual should be protected against the publication of any portraiture of himself; but, where an individual becomes a public character, the case is different. A statesman, author, artist, or inventor, who asks for and desires public recognition, may be said to have surrendered this right to the public. When any one obtains a picture or photograph of such a person, and there is no breach of contract or violation of confidence in the method by which it was obtained, he has the right to reproduce it, whether in a newspaper, magazine, or book. It would be extending this right of protection too far to say that the general public can be prohibited from knowing the personal appearance of great public characters." *Corliss* v. *Walker*, 64 Fed. 280.

We are loath to believe that the man who makes himself useful to mankind surrenders any right to privacy thereby, or that because he permits his picture to be published by one person, and for one purpose, he is forever thereafter precluded from enjoying any of his rights. Just when a man becomes a benefactor of the public, so as to have this effect, is not stated; but we see no reason for so treating Mr. Corliss, to the exclusion of myriads of people who, in a modest but effective way, perform public duties, or philanthropic acts or functions in which the public are interested. We think the result reached in the *Corliss Case* was right, though we cannot adopt the views expressed in the second opinion. See *Corliss* v. *Walker*, 31 L. R. A. 283, and note.

We will return to the case of *Schuyler* v. *Curtis*. In 1895 the court of appeals reversed the decree. See 147 N. Y. 434 (31 L. R. A. 286, 49 Am. St. Rep. 671). It was there held (Mr. Justice Peckham writing the opinion, in which all concurred except Mr. Justice Gray) that "a woman's right of privacy, in so far as it includes the right to prevent the public from making pictures, busts, or statues of her to commemorate her worth or services, does not survive her, so that it can be enforced by her relatives." The decision was put upon the ground that the proposed act could not reasonably be supposed to injure the feelings of any one. The case does not dispose of the existence of the alleged actionable "right of privacy," but, upon the theory of such a right, finds that the plaintiff had not established a case for the intervention of equity; and we think it should not be considered as containing even a *dictum* in support of the doctrine contended for.

In April, 1894, a case was decided involving pictures, viz., *Murray* v. *Engraving Co.*, 31 Abb. New Cas. 266. It was held that:

"A parent cannot maintain an action to enjoin the unauthorized publication of the portrait of an infant child, and for damages for injury to his sensibilities caused by the invasion of his child's privacy; for the law takes no cognizance of a sentimental injury, independent of a wrong to person or property. Nor can such suit be maintained upon the ground that the plaintiff had caused the portrait to be painted, and that the publication is an invasion of his proprietary rights, where it appears that he had given the portrait to his wife."

A full and learned discussion of the authorities relating to the right of recovery for an injury to feelings is found in the case of *Chapman* v. *Telegraph Co.*, 88 Ga. 763 (30 Am. St. Rep. 183), Mr. Justice Lumpkin writing the opinion. It is not our purpose to quote at length from the opinion, which can as well be read. In discussing the Texas rule, which permits such actions, the learned jurist shows how the law may be made uncertain by adopting

the opinions of law writers which have not the authority of adjudicated cases behind them. There is perhaps no more dangerous practice than that, unless it be the kindred one of basing a legal principle upon a *dictum.* The opinion of Mr. Justice Lumpkin contains the most convincing discussion of this subject that we have seen.

In volume 24 of the Solicitors' Journal & Reporter (page 4) will be found an article which indicates that in England it was found necessary to protect the right to control photograph pictures by statute, for the reason that the common law did not afford such protection.

We may search the law books published before 1860 in vain for the assertion of any such right as that claimed, or the denial of the right to publish the truth, for any lawful purpose and in a decent manner, either orally, in writing, or by pictures. What is a picture? It is one of the ways of representing a person or thing. It attempts imitation, rather than description. Pictures antedated letters, and their use was probably one of the earliest methods of communicating thought and perpetuating events. Pantomime and pictures are intelligible to all people, while the same cannot be said of written or even spoken language. This generation owes much to the picture-writing of the ancient Egyptian priests. It is a pleasure to look upon a picture, but it is not alone because it is the picture of a friend. Crowds travel far to see men of celebrity or notoriety. We learn of places and things from pictures. They impart information to those who cannot or will not read, and many times more rapidly and effectually than written description would do to those who can and will. The picture is today an important extension of alphabets, which for a time largely superseded their use; and, if written language were to be deprived of their aid, literature would receive a serious blow. When it can be used, the picture is a much more satisfactory method than the use of the alphabet alone, of conveying an understanding of material objects, animate and inanimate. We are not satisfied that the homes and landscapes

are so entirely within the control of owners that one commits an unlawful invasion of the right of privacy in looking upon their beauties, or by sketching or even photographing them, or that one has a right of action either for damages or to restrain the possessor of a camera from taking a snap shot at the passer-by for his own uses. If we admit the impertinence of the act, it must also be admitted that there are many impertinences which are not actionable, and which courts of equity will not restrain.    As the right alleged is not a property right, and does not spring from any contract, it must follow that relief must be in an action for damages for a breach of duty upon an actionable wrong, or a suit to prevent a threatened injury.    In either case such action must be based upon an act done or threatened which the law looks upon as a tort; and, if the act complained of is one which is not in the law denominated a wrong, there is no legal remedy.

All men are not possessed of the same delicacy of feeling, or the same consideration for the feelings of others. These things depend greatly upon the disposition and education.    Some men are sensitive, some brutal.    The former will suffer keenly from an act or a word that will not affect the latter.    Manifestly, the law cannot make a right of action depend upon the intent of the alleged wrong-doer, or upon the sensitiveness of another.    Although injuries to feelings are recognized as a ground for increasing damages, the law has never given a right of action for an injury to feelings merely.    Slander and libel are based upon an injury to reputation, not the feelings; and although many offensive things may be said that injure feelings and shock and violate the moral sense, even though they be untruthful, they are not necessarily actionable.    To make them so, they must be of such an atrocious character that the law will presume an injury to reputation; or special damage to property interests must be alleged and proved.    What becomes of the innumerable cases of ill-natured and perhaps insulting and im-

moral things that may be said about persons? The answer is that in an enlightened effort to preserve the liberties of men, upon the one hand, and to prevent invasion of their liberties, upon the other, it has been found that a line of demarkation must be drawn, which affords a practical balance and satisfactory test of liability. Mr. Bishop, by his "Diagram of Crime," has made plain the fact that there are many wrongs against the public that are not indictable, because too small for the law to notice. 1 Bish. Cr. Law, § 600. The same is true of private wrongs. Hence, that which would be slanderous *per se* if said in the presence of a third person is not actionable if addressed to the object of the remark in private. The law does not discriminate between persons who are sensitive and those who are not, and the brutality of the remark makes no difference. Yet the alleged "right to privacy" is invaded.

The wisdom of the law has been vindicated by experience. This "law of privacy" seems to have obtained a foothold at one time in the history of our jurisprudence,— not by that name, it is true, but in effect. It is evidenced by the old maxim, "The greater the truth, the greater the libel," and the result has been the emphatic expression of public disapproval, by the emancipation of the press, and the establishment of freedom of speech, and the abolition in most of our States of the maxim quoted, by constitutional provisions; the limitation upon the exercise of these rights being the law of slander and libel, whereby the publication of an untruth that can be presumed, or shown to the satisfaction, not of the plaintiff, but of others (*i. e.*, an impartial jury), to be injurious, not alone to the feelings, but to the reputation, is actionable. Should it be thought that it is a hard rule that is applied in this case, it is only necessary to call attention to the fact that a ready remedy is to be found in legislation. We are not satisfied, however, that the rule is a hard one, and think that the concensus of opinion must be that the complainant contends for a much harder one. The law does not remedy

all evils; it cannot, in the nature of things; and deliberation may well be used in considering the propriety of an innovation such as this case suggests.

We do not wish to be understood as belittling the complaint. We have no reason to doubt the feeling of annoyance alleged. Indeed, we sympathize with it, and marvel at the impertinence that does not respect it. We can only say that it is one of the ills that, under the law, cannot be redressed.

The decree of the learned circuit judge is affirmed.

The other Justices concurred.