## HANNA MFG. CO. v. HILLERICH & BRADSBY CO.

### No. 7527.

Circuit Court of Appeals, Fifth Circuit.
July 15, 1935.

Petition for Rehearing and to Amend Judgment Denied Sept. 18, 1935.

William L. Erwin, of Athens, Ga., Melville Church and Gilbert P. Ritter, both of Washington, D. C., and Howard S. Smith, of Dayton, Ohio, for appellant.

Joseph Harris, Edward S. Rogers, and William T. Woodson, all of Chicago, Ill., and Max Michael, of Athens, Ga., for appellee.

Ambrose L. O'Shea, of New York City, and Joseph H. Clark, of Detroit, Mich., amici curiæ.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

This case deals with baseball bats; and with a patent, trade-marks, and unfair competition in the sale of them. Hillerich & Bradsby Company, an old and the largest manufacturer of bats, brought its bill against Hanna Manufacturing Company, a

newcomer in the business, charging infringement of trade-marks and unfair competition. Hanna Manufacturing Company denied its guilt, and by cross-bill asserted that Hillerich & Bradsby Company was infringing its assigned patent No. 1,770,403, granted to Henry Clay Hanna on July 15, 1930, for an improved bat and method of making it. The District Court held the patent invalid and not infringed; but that Hillerich & Bradsby Company had contracts with certain famous ball players for the use of their names on bats which was an exclusive property right, and that Hanna Manufacturing Company, by using such names on its bats, had violated this property right and had also made an implied misrepresentation which was unfair competition. Injunction was granted against Hanna Manufacturing Company to forbid its using on its bats the name or nickname of any ball player who now or hereafter may have given Hillerich & Bradsby Company the exclusive right to use the name, and forbidding any representation that any such player uses or indorses the Hanna bats or has consented to the use of his name in connection with them; and a reference was ordered to ascertain the damages. Hanna Manufacturing Company appeals.

■ The two claims of the patent are as follows: "1. The method of treating a baseball bat made of wood which consists in impregnating the outer layers of the bat barrels with a mixture containing casein glue, while preserving the handle portion and core of the bat in its natural condition. 2. A wooden baseball bat having the outer growth layer of the barrel portion impregnated with a mixture containing an adhesive and having a relatively resilient barrel core and handle portion." The first or method claim does not cover the apparatus or the procedure set out in the application for patent, but only the use of casein glue and the confinement of it to the outer layers of the bat barrel. The second claim is similar but broader, in that the use of any adhesive is covered. Both parties to this controversy are treating bats with casein glue and confining it more or less perfectly to the outer layers of the barrel, but are using means which differ to some extent. We may assume the usefulness of the treatment. Whether Hanna, the patentee, originated the idea and whether it amounted to invention are the important questions. It is proven that baseball bats suffer by use in two ways. When the point

of impact with the ball is not what may be called the "center of momentum" of the swung bat the bat is thrown into a strain which jars the hands and may break the bat. Again, the impacts of the ball affect the fibre of the wood where struck so as to cause it eventually to splinter or sliver or "check" as it is called. To avoid these things patents have been obtained for a metal core connecting metal caps at each end of the bat (Moore, 1888, No. 377,686), for a spiral groove around the bat carrying a strengthening wire (Truesdell, 1905, No. 780,244), for a bat made of laminated wood (Sadenwater, 1923, No. 1,450,646), and even for a steel bat (Middlekauf, 1926, No. 1,611,858). In recent years lighter bats have been demanded, making necessary the use of more porous wood, which suffers more from "checking." Hanna's idea was that the wood of the handle and center part of the barrel of the bat ought to remain with its natural strength and springiness to minimize breakage, but that the exterior of the barrel ought to be toughened and solidified to prevent "checking" by forcing into the cells of the wood an adhesive, preferably casein glue, which is both waterproof and light. The application for patent describes a process of doing this by placing the bats vertically in a closed chamber partly filled with glue so as to cover the barrels only and then applying air pressure of a degree and for a time sufficient to force the glue into the wood to the desired depth. Such a process and apparatus for impregnating wood is not claimed to be new. Nor is the idea new of confining impregnation to certain portions or depths of the wood, but is illustrated in several prior patents. See Valentine, 1883, No. 285,087; Eckert, 1893, No. 509,724; Zahm, 1901, No. 1,246,029; Meyer, 1922, No. 1,422,119; Zeller, 1922, No. 1,438,471. The question narrows to this: Was it invention for Hanna to conceive that an adhesive, specifically casein glue, would toughen the surface of the bat and could be confined to the portion of it where such toughening was desirable? The evidence shows that for thirty years or more crude oil and linseed oil, which latter on oxidation solidifies and binds the wood fibres together as an adhesive, had been extensively used on the barrels of baseball bats to prevent "checking," penetration being limited to avoid making them too heavy. Appellee used to sell them under the name "oil tempered." Pressure impregnation of wood to toughen or to preserve it has been

covered by several old patents. In a patent to Wellhouse & Hagen in 1879, No. 216,589, wood is treated by exhausting the air from its pores and then injecting under pressure chloride of zinc, gelatin, and tannin. We find in it these statements: "The action of chloride of zinc is well understood. * * * The office of the glue is to toughen the wood and to close the pores of the wood. * * * The tannin is used to render the gelatin insoluble. * * * The effect is both to fix the chloride of zinc within the wood so that it cannot leave the wood and to render the wood tougher and stronger throughout. * * * Ordinary glue can be used as a desirable form of gelatin. * * * The glue without the tannin is valuable in hardening and strengthening the wood." Glue is used to toughen the wood in Willner, 1899, No. 620,627. In the later patent to Roy, 1920, No. 1,356,015, casein is the preferred material to be used. Considering what was well known in the wood-treating art and the practices already in vogue with reference to baseball bats, we do not think there was invention either in using an adhesive, specifically casein glue, to toughen the surface of the bat, nor in confining it by well-known practices to the portions of the wood desired to be affected. Neither claim of the patent is valid. There is no need to decide whether, as contended, the appellee had anticipated Hanna in this treatment of bats. Both parties are free to practice it.

The District Judge held that appellant had not technically infringed any trade-mark of appellee and that ruling is not contested. We think also that there is no case of "passing off" the goods made by appellant as made by appellee. There is some evidence that this has been suggested and attempted, but we do not think it proven that it has been accomplished. The bats of appellant are all conspicuously marked with its own registered trade-mark, "Hanna Batrite, Athens, Georgia," and those of appellee with its registered trade-mark, "Louisville Slugger, Made by Hillerich & Bradsby Company, Louisville, Kentucky." Neither these marks nor the dress and appearance of the respective goods are such as to cause confusion as to the source of them. The high grade bats in contention retail for as much as $2.50 each, and are bought usually by customers who are careful and well-informed. There is no reasonable ground to believe that the bats of one manufacturer are really passed off as those of the other, although it is testified that many purchasers care but little about the manufacturer and more about the players' names on the bats, now about to be discussed. The significance of these names is the heart of the case.

It appears that in the sporting goods trade the name of some famous sportsman is often given to an article by its manufacturer or seller for mere advertising purposes, that sportsman having no personal connection with the article and the article often having no particular merit. But in the case of baseball bats for thirty or more years several manufacturers, including the predecessors of appellee, have affixed the names of famous ballplayers, usually in autograph form, to their best bats of the style preferred by such players, so that an "autograph bat" or a "player's name bat" has come to connote a special connection with the player whose name it bears. Appellee, while not the first to use or exploit this means of popularizing its goods, has been most assiduous in its cultivation. For many years it has had a contact man whose duty it is to become acquainted with professional ballplayers of promise, to take pains to make bats for them of such size, shape, and balance as they may prefer, thus inducing their use of appellee's bats, which are bought direct and marked with such player's name. The player in return, sometimes for a small consideration, signs an agreement that for 20 or 25 years appellee shall have the exclusive right to use his name, autograph or photograph in connection with the advertising and sale of baseball bats, and consenting to registration of them as trade-marks. Many autographs and photographs have been so registered. Appellee has thousands of such agreements. When a player becomes famous as a batsman, his name on the bats is supposed to have sales value. It is the practice of appellee each year to select ten or twelve names which have led the batting records for the preceding year and to press particularly the sales of bats duplicating those made for each of said players, marking them with their respective autographs. The advertising states that the bat so autographed is designed or preferred and used by the player whose name it bears, and that he has authorized the use of his name on it. Appellee has contracts with most of the professional players and most of them buy their bats from it, and its sales are by far the largest of any manufacturer. The style bat preferred by and made

for a player, say "Babe Ruth" or "Lou Gehrig," is generally constant in shape and proportion but may vary some in length and weight. It is carefully reproduced for sale under the autograph, so that bats of that exact shape and proportion are known as "Ruth bats" or "Gehrig bats," and such styles are very generally thus identified and called for. The fame of the players naturally gives popularity to the sort of bat they respectively use and prefer. Other manufacturers, including appellant, have had some similar contracts with other players, but they have also copied the styles of bats thus put out by appellee, putting on them in addition to their own trade-marks, not the appropriate autograph of the player, but his surname in block type, as "Ruth" or "Gehrig," and have offered them in successful competition with the similar ones of appellee. Appellant says this is but truthfully to identify a particular style of bat made by itself and which it is free to make and sell, and violates no right of appellee. Appellee says its rights are infringed thereby.

■ The District Court held that "Baseball players, like any other individuals, have a property right to their names. This property right is capable of assignment and has been assigned by certain players to the plaintiff, and the plaintiff has used and advertised such right and has such right exclusively, irrespective of any trademark or unfair competition law." We are unwilling to go so far. It was said in Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 S. Ct. 625, 627, 35 L. Ed. 247, "A man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property." That, however, was said of one's right to use his own name fairly on his own goods. The right to prohibit others from using his name or likeness publicly without his consent, no trade-mark or unfair competition in trade being involved, has since been the subject of interesting discussions as a "right of privacy." Some courts have thought the right to be one of property; others more reasonably have considered it a personal right like the right of liberty or security or reputation, and consequently dying with the person; and some have denied the right altogether. In Schuyler v. Curtis, 147 N. Y. 434, 42 N. E. 22, 31 L. R. A. 286, 49 Am. St. Rep. 671, the right was seemingly recognized but held to die with the person and not to pass to surviving relatives. In Atkinson v. John E. Doherty & Co., 121 Mich. 372, 80 N. W. 285, 46 L. R. A. 219, 80 Am. St. Rep. 507, the name and likeness of a well-known lawyer and politician were put on a cigar label without his consent. It was held that neither he in his life nor his widow after his death could complain, there being no libel. In Corliss v. E. W. Walker Co. (C. C.) 57 F. 434, 31 L. R. A. 283; Id. (C. C.) 64 F. 280, 31 L. R. A. 283, the idea was upheld that a public man waives his right so that the public become entitled to his likeness. In Roberson v. Rochester Folding-Box Co., 171 N. Y. 538, 540, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828, the absolute right of privacy was denied altogether by a divided court, and the unpermitted likeness of a young woman used by a milling company on its flour was held to give no right of action. This conclusion was on elaborate consideration rejected in Pavesich v. New England Life Ins. Co., 122 Ga. 190, 50 S. E. 68, 69 L. R. A. 101, 106 Am. St. Rep. 104, 2 Ann. Cas. 561, and the unpermitted use of a man's likeness in advertising was enjoined. Waiver of the right of privacy was recognized as to persons in public life; and it was held that advertising which untruthfully represented that the person was a patron of the advertiser was a libel. The Georgia court's conclusion was in turn rejected in Henry v. Cherry & Webb, 30 R. I. 13, 73 A. 97, 24 L. R. A. (N. S.) 991, 136 Am. St. Rep. 928, 18 Ann. Cas. 1006, and the views of the New York court followed. In New York the Legislature by statute established the right to restrain the unpermitted commercial use of one's name or likeness, and the statute was upheld in Binns v. Vitagraph Co., 210 N. Y. 51, 103 N. E. 1108, L. R. A. 1915C, 839, Ann. Cas. 1915B, 1024. From this incomplete review it is evident that a famous batsman, aside from questions of trademark and unfair competition or libel, might have difficulty in keeping his name and likeness from respectful use by others. But if they be his property in a sense, they are not vendible in gross so as to pass from purchaser to purchaser unconnected with any trade or business. Fame is not merchandise. It would help neither sportsmanship nor business to uphold the sale of a famous name to the highest bidder as property. Moreover, appellee is not by its contracts the assignee as of property of the name and likeness of these players. The usual form of the contract grants "the sole

and exclusive right for twenty years of the use of my name, autograph, portrait, photograph, initials or nickname for trademark or advertising purposes in connection with the manufacture or sale of baseball bats." The signer does not divest himself of his name and likeness, but gives a permission or license to use them for a stated purpose and for a limited time. Since the players were not makers or sellers of bats and sold no business together with its marks and good will to appellee, the contracts in our opinion in and of themselves operate only to prevent the signers from objecting to appellee's use of their names and likeness. The right or wrong as against appellee of their use by others rests on the law of trade-mark and unfair competition, or unfair trade, and depends not so much on appellee's contracts as on the actual use in trade by appellee of the names and likenesses. It is the trade rather than the names and likenesses which the law will protect as property.[1]

While some of them have been used and registered as trade-marks there has been, as above stated, no infringement of trade-marks. But that appellant's goods are plainly distinguished by trade-mark and colors from the goods of appellee so that the origin of them is not concealed and there is no palming of them off as made by appellee does not end the matter of unfair competition. This record establishes that the famous professional ballplayers whose names are in controversy do in fact use appellee's bats and have indorsed them to the extent of allowing their name and likeness to go on them, and that this has been much advertised and has great sales value. It enters into the good will of appellee's established business. If appellant's use of these players' names in fact is calculated to lead buyers to suppose that these players are using Hanna bats and are indorsing them and permitting their names to be used on them, so that persons who would have bought Slugger bats are buying Hanna bats, there is an unfair and fraudulent thing done which the law may remedy. On this point of fact the evidence is not all one way. Some of the witnesses very reasonably say that while a player's personal autograph on a bat according to the usual practice of appellee naturally is understood to mean an indorsement and recommendation of the bat, somewhat like a blank indorsement on a check, that the surname in print on a bat is not personal and is naturally understood to refer to the model or style of the bat, implying no indorsement by the player of that particular bat. It is well established that the purchasers refer to the style of bats by the surnames of the players, disliking the use of model numbers to signify the same thing, so that to many a "Ruth bat" signifies only a particular style of bat familiar to the expert without any reference to who made it. There is indeed no other name for it. It is to be observed that the players who have contracted with appellee and the salesmen and dealers who sell appellee's bats think that a "Ruth bat" connotes that appellee made it; but the college coaches who buy bats and the dealers who sell other makes of bats think that the term refers only to the style or shape and not to the manufacturer. The asserted connotation that Ruth uses that make of bats rests on the assertion to that effect in appellee's advertising. The contracts with Ruth and the other players say nothing about using appellee's bats and do not bind the signers to use them. It appears that Gehrig, whose shape of bat is very popular, did in fact for two years use Hanna bats, notwithstanding his contract with appellee. Appellee no doubt during the two years continued to use his autograph on bats, as it had a right under the contract with him to do. Since the contracts do not prohibit the players who signed them from using any bats they please, and since appellee may use their autographs on bats which they are not using, it is far-fetched to say that the names on the bats indicate of themselves that the players are using that make of bats. The styles and models of bats preferred or designed by the several players are not patented. Appellant or any one else is free to imitate them and to mark them truthfully as what they are, not infringing, of course, any trade-mark. In contrast with appellee's use of autographs of players which very naturally imply an indorsement of the bat, appellant's use of the printed surname in view of the general trade use of the surname to indicate the style or model only would not necessarily

---

[1] There is no property even in a trademark apart from the trade in which it is employed. American Steel Foundries v. Robertson, 269 U. S. 372, 46 S. Ct. 160, 70 L. Ed. 317. "It is the trade, and not the mark, that is to be protected." Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 416, 36 S. Ct. 357, 361, 60 L. Ed. 713.

be deceptive and might yet come not to be so. The name of the maker of an article was held to have come to mean the article itself rather than its manufacturer in Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118. But we are not prepared to say that the District Judge was wrong in concluding under the present evidence that the appellant's use of the player's bare surname tends to mislead at least some of the buying public and to divert trade that would otherwise go to appellee. The appellant "must purge its business methods of a capacity to deceive." Federal Trade Commission v. Algoma Lumber Co., 291 U. S. 67, 81, 54 S. Ct. 315, 321, 78 L. Ed. 655. For the reason that the damage done is difficult or impossible to be definitely proven, this wrong should be prevented by injunction, but that granted is too sweeping. If appellant should add to the player's name the word "style" or "shape," the information that it says it is trying to convey would be effectually given, but the false impression that appellee claims is made by using the player's name alone would be rebutted. Such a descriptive mark as "Ruth style" should therefore be permitted. The injunction also should not forbid appellant from advertising that players who have contracted with appellee use appellant's bats if in fact they at the time do use them. Appellant may advertise what is true. The injunctive paragraphs of the decree are accordingly modified to read as in the margin written.[2] Baglin v. Cusenier Co., 221 U. S. 580, 601, 31 S. Ct. 669, 55 L. Ed. 863; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 204, 16 S. Ct. 1002, 41 L. Ed. 118. We see little evidence to prove definitely that any bats have been bought of appellant which would have been bought of appellee but for the belief that the player's name on them meant that the player indorsed and was using that make as well as that style of bat, but the hearing under the reference may develop such. The decree as above modified is affirmed, with costs of appeal equally divided between the parties.

[2] (a) From using on bats the name or nickname of any baseball player who is under contract with plaintiff to give plaintiff the exclusive right to use his name or nickname of which contract defendant has notice and which name or nickname plaintiff uses or intends to use on its bats, or from selling or advertising for sale bats bearing such name or nickname (except special orders of such player for bats for his own personal use), unless such name or nickname be followed conspicuously by the words "style" or "shape."

(b) From falsely representing in advertising or otherwise that such player designed, uses or endorses defendant's bats or has consented to the use of his name by defendant in connection with the manufacture, advertisement, or sale of defendant's bats.