**BERG v. MINNEAPOLIS STAR & TRIBUNE CO.**

Civ. No. 2703.

United States District Court
D. Minnesota, Fourth Division.
Sept. 15, 1948.

A. R. Segal and Ralph L. Berman, both of Minneapolis, appeared in behalf of the plaintiff in opposition thereto.

Robert J. Christianson and John S. Pillsbury, Jr., both of Minneapolis, Minn. (Faegre & Benson, of Minneapolis, Minn., of counsel), appeared in behalf of defendant in support of said motion.

NORDBYE, District Judge.

At the time of the occurrence which forms the basis of this action, defendant was publishing a newspaper of general circulation in Minneapolis and throughout this State called "The Times, The Picture Newspaper." The complaint alleges that plaintiff is a resident of Minneapolis who "did lead a quiet peaceful life free from the prying curiosity and unmitigated gossip which accompanies fame, notoriety, and scandal; * * * did pursue his useful toil with its homely joys and destiny obscure, did deem it wise and provident and comforting to keep the noiseless tenor of his way far from the maddening crowd's ignoble strife of scandal and notoriety; * * * has ever shunned and avoided notoriety and publicity, and has ever held as precious his right of privacy relative to his personality, his acts, sayings, and pictures, in all his social relations, his church groups, and his business transactions." And that he "has never exhibited himself, nor exploited his family life, his reputation, or his picture for money, profit, or commercial gain." The complaint alleges further that defendant's agents "with deliberate intent, * * * and being specifically advised that they were forbidden to take, use, and publish in any shape, form, or posture the picture or pictures of the plaintiff, did" while plaintiff was in a courtroom of the District Court of Hennepin County, "wilfully and maliciously, with intent to injure this plaintiff and bring him into public notoriety and to destroy the comfort of his life, and also the peace and tranquility of his mind, and to thrust upon this plaintiff unsought, unwarranted, and

958

undesired publicity and notoriety utterly obnoxious to the plaintiff and with intent to annihilate and destroy the seclusion of plaintiff's private life, and to exploit plaintiff's name and personality, did wilfully, wantonly, and maliciously take said plaintiff's picture * * * over and above the express protests of the plaintiff and his legal counsel, and did publish the said plaintiff's picture in the said 'Times, The Picture Paper', on or about February 18, 1948, * * * together with certain comments thereon, over and above his express objections and expressions of disapproval."

Plaintiff then asserts that the picture and its publication in the defendant's edition on or about February 18, 1948, injured and damaged him in the following respects: "That the plaintiff's personality has been violated by being exposed, exhibited, and sold to the public; that the plaintiff's name has been cheapened and made notorious; that the plaintiff has been subjected to the contempt, ridicule, and inquisitive notice of the general public to the injury of his personality, his business associations, and the outrage of the finer sentiments of his nature, and to the humiliation of his self-respect; that plaintiff's peace of mind has been destroyed and disturbed; that plaintiff's privacy has been invaded and his right of privacy violated; that plaintiff, himself, a private person and having an individual personality, has been made notorious and conspicuous to the public and has been singled out for and indentified to the public notice and attention, which is utterly obnoxious to this plaintiff." And it is contended that, as a consequence thereof, he suffered to his damage great mental pain, anquish, humiliation and distress.

In view of the disposition of this motion on the alternative motion for summary judgment, it is not necessary to decide whether the complaint constitutes a cause of action upon which relief can be granted. The showing on the motion for summary judgment, together with the contents of the divorce file in Carl A. Berg v. Ruby V. Berg, File No. 446444, referred to in one of the affidavits proferred by the defendant, indicates the following:

Plaintiff was involved in a divorce suit, and on August 13, 1946, obtained an uncontested divorce decree and the custody of his two minor children. It would appear that thereafter, and in December, 1947, his former wife petitioned for an order setting aside and vacating the divorce decree on the alleged grounds that her husband had threatened her with bodily harm and that he would defame and slander her if she contested the divorce action. The petition of Mrs. Berg came on for hearing before one of the judges of the Hennepin County District Court, and on January 27, 1948, the court filed an order setting aside and vacating the judgment and decree granting plaintiff a divorce, and ordered that the divorce proceedings be placed on the trial calendar. The court found on the motion made to set aside the uncontested divorce decree that there was support for the contention that fraud had been perpetrated by the plaintiff, not only upon the defendant, but also upon the court and that the claimed acts of plaintiff constituted an obstruction to the administration of justice. Plaintiff filed a notice of appeal with supersedeas to the Supreme Court from this order, and the appeal is now pending. Although the order vacating the divorce decree is stayed pending the appeal, for convenience the parties will be referred to herein as husband and wife.

Thereafter, proceedings regarding the custody of the Berg children came before the Hennepin County District Court and a hearing was held before one of the judges of that court on February 17, 1948. The parties were in court with their two minor children. Plaintiff contended that his wife was not a proper person to have the custody of the children and offered testimony by several witnesses charging her with misconduct of a serious and somewhat scandalous nature. It was during a recess in this hearing and after the court had left the Bench that over the protests of Berg a photographer employed by the Times took his picture while he was in the courtroom. In the same issue of the paper in which plaintiff's picture was portrayed, there were also published pictures of the two children with their mother. The pic-

ture of plaintiff depicted him as a well-dressed man garbed in his overcoat and muffler facing the camera, and apparently it is a normal, natural likeness of the plaintiff. There is no contention to the contrary. From the picture as it was published, it would be quite impossible to tell whether it was taken in a courtroom or elsewhere. Under the picture of the plaintiff is the title, "Carl Berg, 37, Father of Children, Whose Custody He is Contesting." Under one of the pictures of Mrs. Berg and the children appears the following: "Mrs. Berg, 36, Comforts Youngsters During a Break in Trial," and below the other picture which shows Mrs. Berg with her arms around the children appears the following: "Bewildered, Charleen, 7, and Charles, 3½, Stick Close to Mother, Mrs. Berg." Under the three pictures appears a news item regarding the nature of the proceedings and a purported summary of some of the testimony of some of the plaintiff's witnesses regarding the unfitness of his wife to have custody of the two children. It is not claimed that the newspaper account of the proceedings is in error or presents anything but a reasonably correct summary of the testimony it purported to cover. Plaintiff bases his entire claim on the alleged wrongful use of this photograph taken over his objection and published in a daily newspaper of wide circulation. It does not appear that the news item itself forms any basis for his alleged cause of action, except the question as to whether or not it constitutes a legitimate news story and the bearing that may have upon the right of the defendant to publish plaintiff's picture in connection therewith. Plaintiff bases his action solely upon the theory that, under the common law, his right of privacy has been violated.

The pioneers in the enunciation of the doctrine of the right of privacy were the distinguished writers Samuel D. Warren and Louis D. Brandeis, later Justice Brandeis of the United States Supreme Court, who published an article in the year 1890 entitled The Right to Privacy, 4 Harvard Law Review 193. The article stressed the need of man to live his life without the intrusion of others upon his private affairs, and his inalienable right to live his life in solitude and privacy if he wills without unwarranted publicity regarding matters with which the public has no legitimate concern. In brief, it may be said that the doctrine is bottomed on man's "right to be let alone." This right was not recognized at common law prior to 1890, but its proponents urge its recognition as a part of the common law because the complexities and intensity of modern life require some protection to be accorded to him who desires to lead a life of privacy, seclusion and anonymity. Prior to 1890, it is generally conceded that the violations of the socalled right of privacy were not based upon the recognition of that right, but founded upon some right of property or a breach of trust or breach of confidence. The article of Warren and Brandeis was hailed as a treatise which created a new concept of a common law right and that it illustrated the well-known principle that the common law must keep abreast with the demands made by the continuous changes in modern society. The authors rationalized that the acceptance of this new concept of the common law was imperative under modern conditions of living because, among other things, "instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" (p. 195). Although the States which have had occasion to comment upon this doctrine are divided in their acceptance of it, there is respectable and persuasive authority which has recognized the doctrine under certain circumstances as one which forms the legal basis for the granting of relief. It seems fair to state that most of the cases upholding the doctrine involved situations where plaintiff's photograph had been used for commercial gain in the defendant's advertisements, for sheer commercial purposes, or other uses of photographs which the courts deemed to be wholly, if not outrageously, unwarranted.

Plaintiff relies principally upon Pavesich v. New England Life Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68, 69 L.R.A. 101, 106 Am.St.Rep. 104, 2 Ann.Cas. 561; Hinish v. Meier and Frank Co., 1941, 166 Or. 482,

113 P.2d 438, 138 A.L.R. 1; Cason v. Baskin, 1944, 155 Fla. 198, 20 So.2d 243, 168 A.L.R. 430; Reed v. Real Detective Publishing Co., 1945, 63 Ariz. 294, 162 P.2d 133; Kerby v. Hal Roach Studios, 1942, 53 Cal.App.2d 207, 127 P.2d 577; Peed v. Washington Times Co., 1927, 55 Wash.Law Reports, 182; Munden v. Harris, 153 Mo. App. 652, 134 S.W. 1076; Melvin v. Reid, 112 Cal.App. 285, 297 P. 91; Barber v. Time, Inc., 348 Mo. 1199, 159 S.W.2d 291; Peay v. Curtis Publishing Co., D.C., 78 F. Supp. 305.

Defendant relies upon cases which refuse to recognize the doctrine and contends that any relief to remedy any invasion of the rights of privacy should be based upon some statutory enactment. Roberson v. Rochester Folding Box Co., 1902, 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, 89 Am.St.Rep. 828; Judevine v. Benzies-Montanye Fuel & Warehouse Co., 1936, 222 Wis. 512, 269 N.W. 295, 106 A.L.R. 1443; Atkinson v. John E. Doherty & Co., 1899, 121 Mich. 372, 80 N.W. 285, 46 L.R.A. 219, 80 Am. St.Rep. 507; Henry v. Cherry & Webb, 1909, 30 R.I. 13, 73 A. 97, 24 L.R.A.,N.S., 991, 136 Am.St.Rep. 928, 18 Ann.Cas. 1006; Hillman v. Star Publishing Co., 1911, 64 Wash. 691, 117 P. 594, 35 L.R.A.,N.S., 595; Themo v. New England Newspaper Publishing Co., 1940, 306 Mass. 54, 27 N.E.2d 753; Thayer v. Worcester Post Co., 1933, 284 Mass. 160, 187 N.E. 292; Sidis v. F-R Publishing Corp., 2 Cir., 1940, 113 F.2d 806, 138 A.L.R. 15, certiorari denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462.

Minnesota has no statute which affords plaintiff any relief and the courts of this State have not had any occasion to pass upon the doctrine upon which plaintiff relies, although defendant urges that Minnesota would follow Wisconsin, Michigan, and New York, in that for historical reasons Minnesota has looked to these jurisdictions in determining the common law to be adopted in this State. But, after due consideration, this Court does not find it necessary to decide what the Minnesota courts would determine the common law to be in that regard if and when that question comes before them. For even assuming that the courts of this State would embrace as a part of its common law the doctrine of the right of privacy, the showing herein under the admitted facts will not sustain a right of recovery.

Warren and Brandeis recognized that "The right to privacy does not prohibit any publication of matter which is of public or general interest." (p. 214). Undoubtedly, in considering this question, the courts should recognize the rights of privacy of the individual on one hand, and the rights of the Press to disseminate news and the rights of the public to obtain legitimate news from the newspapers in their community on the other. When one assumes to determine what constitutes legitimate news, it is undoubtedly true that there may be a wide and marked diversity of opinion as to what should be so designated. Some people would like to see newspapers refrain from publishing any items of news regarding the intimacies disclosed in divorce cases or any salacious testimony divulged in matters before the courts, contending that, as stated by Warren and Brandeis, they only seem to satisfy a "prurient taste." Others feel that the public interest is such that the citizens have a right to be informed as to that which takes place in the community, especially at a public trial, and if the news is true and not libelous, fit to print and newsworthy, it should be published. The Press blames the public and contends that the public demands that it be afforded news coverage regarding such matters, while others contend that the Press has overstepped the bounds of propriety in pursuing the trade of gathering all trivial gossip and sensational stories which may be unfolded in any court trial in order to cater to the lowest tastes in our citizenry and thereby increase the sale of their newspapers. That is, the supply of such news creates the demand, not vice versa. That the American public is interested in news concerning court proceedings and court trials is evident. Traditionally, since pioneer days people have flocked to trials when courts were in session out of curiosity or perhaps in order to see drama which their daily lives did not provide, and that this same curiosity and interest is evident today is to be observed in any courtroom when there is a proceeding involving a criminal case of interest or the sensational details of some divorce suit or matrimonial triangle, and to those who cannot attend,

the newspapers assume to furnish a daily account of the proceedings.

■ Plaintiff probably does not fully appreciate that, through the force of circumstances, he was required to throw aside the mantle of privacy and the "noiseless tenor of his way, far from the maddening crowd's ignoble strife of scandal and notoriety" in his divorce proceedings and his attempt to retain the custody of his children granted him in the divorce suit. But the undeniable fact is that he had made public the most intimate and indeed scandalous occurrences of his domestic life and had them spread on the public records of a court of his choosing, and, in so doing, he departed from his "quiet peaceful life free from the prying curiosity and unmitigated gossip which accompanies fame, notoriety and scandal" and in a sense became a quasi-public figure in the community and particularly in his own strata of society. On his wife's petition to set aside and vacate the divorce decree, one of the judges of the court found that a sufficient showing had been made to grant the petition upon the grounds that fraud had been committed, not only upon her, but upon the court. This fact alone tended to place his domestic affairs in the pitiless light of publicity and the case of Berg v. Berg became something more than a routine default divorce suit. As stated in Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W.2d 972, 973, "The right of privacy may be defined as the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short, it is the right to be let alone. 21 R. C.L. 1197, 1198. There are times, however, when one, whether willingly or not, becomes an actor in an occurrence of public or general interest. When this takes place, he emerges from his seclusion, and it is not an invasion of his right of privacy to publish his photograph with an account of such occurrence. Brents v. Morgan, 221 Ky. 765, 299 S.W. 967, 55 A.L.R. 964."

Certainly, this Court should proceed with caution before it attempts to sit as a censor and to interfere with the traditional right of the Press to print all printable news which appears in the public records of our courts. Unfortunate as it may be for the principals who make charges and defend counter-charges of misconduct in order to obtain freedom from an allegedly erring spouse or the custody of their children in divorce proceedings, the indisputable fact remains that there are many people in the immediate community where the action is pending who look to the Press for all such details, and it does not seem to avail that the more intelligent public deprecates that such published details "usurp the place of interest in brains capable of other things." p. 196, 4 Harvard Law Review.

Moreover, it cannot be controverted that there is a wide-spread interest in this very kind of news and perhaps it is not strange that it should be so. Most people are interested in the weather because it generally concerns all classes of people. Domestic disputes, controversies between parents and others as to the custody of minor children, allowances of alimony, and the various acts and conduct recognized by the courts as grounds for divorce, are probably of interest to a large number of people because in their own immediate lives, to a greater or less degree, such problems have concerned their friends and acquaintances and sometimes their own immediate families. And as recognized by the eminent writers from whom the doctrine of the right of privacy stems, "it is only the more flagrant breaches of decency and propriety that could in practice be reached, and it is not perhaps desirable even to attempt to repress everything which the nicest taste and keenest sense of the respect due to private life would condemn." p. 216, 4 Harvard Law Review.

■ Plaintiff does not contend that the article accompanying the photograph in any way presents an inaccurate or distorted picture of the court proceedings. Nor is it contended that the picture depicts him in any other light than in a normal and natural pose. In other words, if the news item constitutes legitimate news, the picture seems entirely appropriate to the news. If the Court, therefore, is correct in holding that the news published by the defendant regarding the custody proceedings constitutes a legitimate news item, and it would seem that no other view can be entertained under the admitted situation, it must follow that the publishing of Berg's

picture in the manner indicated did not violate any right of privacy which the law may afford. That is, if Berg, by his litigation with his wife and the proceedings to retain the custody of his children, made himself a legitimate item of news, it would seem that the personal appearance of the participants by way of photographs is a matter in which the public would have a legitimate interest. The note writer in 138 A.L.R. who covers in an extended article the subject of the right of privacy, states on p. 78, that "it is settled that the publication of a person's name or picture in connection with the news or historical event of legitimate public interest does not constitute an actionable invasion of the right of privacy." And he cites Jones v. Herald Post Co., 1929, 230 Ky. 227, 18 S.W. 2d 972; Metter v. Los Angeles Examiner, 1939, 35 Cal.App.2d 304, 95 P.2d 491; Themo v. New England Newspaper Publishing Co., supra; Thayer v. Worcester Post Co., supra; Hillman v. Star Publishing Co., supra.

The fact that the picture was taken of the plaintiff in the courtroom does not add to, nor detract from, whatever right he may have to recover herein. There is no rule of court in the Hennepin County District Court which prohibits the taking of photographs in the courtroom when the judge is not on the Bench. The impertinence of newspaper photographers in taking pictures of persons involved in court proceedings when they are in the courtroom or court buildings may well be condemned as a nuisance and often constitutes an unwarranted interference with the orderly functioning of our courts, but the curbing of such practices must rest with the courts by appropriate rule which will tend to limit such activities, or by the enactment of legislation which might place some reasonable limits upon the assumed privileges of newspaper photographers under such circumstances. In any event, it seems clear that, in this proceeding, the Court should not be called upon to attempt to legislate in effect on the subject nor to indulge in the promulgation of any court rule in absence thereof. Warren and Brandeis refer in their article to the Press' overstepping "in every direction the obvious bounds of propriety and of decency."

p. 196, 4 Harvard Law Review. The authors made that observation in the staid days of the Nineties, when the standards of our theatres, newspapers, magazines, and current literature were considered to be higher than they are today, but over half a century has passed since that writing and no legislation has been called to the Court's attention which has in any way assumed to limit such alleged improprieties. That we have gone much further since that time in attaching importance in the news to trivial things and sheer gossip regarding the intimate details of the lives of important and near-important people is undoubtedly true, but in proceedings of this kind the courts should not attempt to determine whether the Press is to blame or whether it is merely catering to the present mores of the people. By the accepted standards of most of the newspapers in this country, and certainly a goodly number of the people, court proceedings such as the Berg contest over custody of the children constitute legitimate news in view of the circumstances related, and the publication of Berg's picture in connection with the legitimate news was within the scope of the accepted prerogatives assumed by the Press, which is charged with the responsibility of furnishing news to the public. And as Judge Clark said in the Sidis case, supra, at page 809 of 113 F.2d:

"* * * Everyone will agree that at some point the public interest in obtaining information becomes dominant over the individual's desire for privacy. Warren and Brandeis were willing to lift the veil somewhat in the case of public officers. We would go further, though we are not yet prepared to say how far. At least we would permit limited scrutiny of the 'private' life of any person who has achieved, or has had thrust upon him, the questionable and indefinable status of a 'public figure.' * * *

"Regrettably or not, the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day."

The allegation in the complaint that the taking of the photograph over plaintiff's objection was wilfull and actuated by malice will not buttress his alleged cause of action if his right of privacy has not been invaded. This appears from the article of Warren and Brandeis in which they say, on page 218, "Personal ill-will is not an ingredient of the offence, any more than in an ordinary case of trespass to person or to property." And as stated by Judge Clark in the Sidis case, supra at page 809 of 113 F.2d:

"Plaintiff in his first 'cause of action' charged actual malice in the publication, and now claims that an order of dismissal was improper in the face of such an allegation. We cannot agree. If plaintiff's right of privacy was not invaded by the article, the existence of actual malice in its publication would not change that result." And in accord is Lewis v. Physicians and Dentists Credit Bureau, Inc., 1947, 27 Wash.2d 267, 177 P.2d 896.

The Court concludes, therefore, that on this showing any invasion of privacy, if it be characterized as such, has not gone beyond the bounds of the right of the Press to disseminate legitimate news, and is constrained to find that there is no genuine issue of fact to be tried and that defendant is entitled to judgment in its favor. It is so ordered.

An exception is allowed to the plaintiff.