WEEREN *v.* EVENING NEWS ASSOCIATION.

Decision of the Court.

1. Judgment—Summary Judgment—Libel and Slander—Invasion of Privacy.

> Summary judgment in action for defamation and invasion of right of privacy arising from retelecast of film entitled "A Bell for Okinawa" is reversed and trial is ordered on latter theory by Black, J.; on former theory by Souris, J.; and on both theories by T. M. Kavanagh and Adams, JJ.; with Dethmers, C. J., and O'Hara and Brennan, JJ., dissenting on the ground that plaintiff was not, as a matter of law, entitled to recover under either theory.

---

References for Points in Headnotes

[1, 3–5, 7–9, 13–15, 26, 27, 40, 41] 41 Am Jur, Pleading §§ 340–343.

[2, 29, 31] 33 Am Jur, Libel and Slander § 292.

[6, 38] 41 Am Jur, Privacy § 32.

Right of privacy. 138 ALR 22, 14 ALR2d 750.

[10] 4 and 5 Am Jur 2d, Appeal and Error §§ 104, 853.

[11, 23, 24, 28] 33 Am Jur, Libel and Slander § 232 *et seq.*; 41 Am Jur, Pleading §§ 44–46.

[12] 41 Am Jur, Pleading §§ 44–46.

[16, 17] 41 Am Jur, Privacy § 20 *et seq.*

Right of privacy. 138 ALR 22, 14 ALR2d 750.

[18, 19] 41 Am Jur, Privacy §§ 17–19.

[20] 5 Am Jur 2d, Appeal and Error § 1011.

[21] 4 and 5 Am Jur 2d, Appeal and Error §§ 491, 853.

[22] 33 Am Jur, Libel and Slander § 292; 41 Am Jur, Pleading §§ 340–343.

[25] 53 Am Jur, Trial § 332 *et seq.*

[30] 16 Am Jur 2d, Constitutional Law § 341 *et seq.*

The Supreme Court and the right of free speech and press. 93 L ed 1151; 2 L ed 2d 1706.

[32] 33 Am Jur, Libel and Slander § 124 *et seq.*

[33–35] 33 Am Jur, Libel and Slander § 161 *et seq.*; 39 Am Jur, Newspapers and Press Associations § 31.

[36] 41 Am Jur, Privacy § 34.

Right of privacy. 138 ALR 22, 14 ALR2d 750.

[37] 41 Am Jur, Privacy § 21.

[39] 20 Am Jur 2d, Costs § 14.

[42–44] 33 Am Jur, Libel and Slander § 124 *et seq.*; 44 Am Jur, Radio §§ 21, 22.

Legal aspects of television. 15 ALR2d 785.

[45] 41 Am Jur, Privacy § 23.

Separate Opinion.

Black, J.

2. Libel and Slander—Telecast—A Bell for Okinawa—Defamation.

*Telecast of "A Bell for Okinawa" held, not to have constituted an actionable defamation of plaintiff as a matter of law.*

3. Judgment—Summary Judgment—Pleading—Invasion of Privacy—Telecast.

*Summary judgment should be denied and cause should be determined in course of complete trial where pleadings allege an invasion of privacy because of repetition of telecast to which party had voiced objections, there being an issue of fact for determination.*

4. Same—Summary Judgment—Necessity for Trial.

*Validity of a well-pleaded affirmative defense raising a question of fact in a case where a jury has been demanded should not be determined on motion for summary judgment, but may be rightfully tested only at close of all proofs and then by motion for an instructed negative verdict.*

5. Privacy, Right of—Summary Judgment—Trial—Invasion of Privacy—Telecast.

*Trial by jury, as distinguished from grant of summary judgment, is necessary to determine whether plaintiff had an action for invasion of privacy when telecast was repeated after he had requested defendant to cease and desist from further showing of film, and whether defendant had an affirmative defense in its allegation that plaintiff had become a newsworthy public figure.*

6. Same—Trial—Invasion of Privacy—Question for Trier of Facts.

*Intrusion of constitutional questions into an action for invasion of privacy requires of courts that they develop precedents of substance only where facts are completely and testimonially assembled before trial judge or trial jury.*

7. Same—Judgment—Summary Judgment—Invasion of Privacy.

*Full hearing on question of invasion of privacy because of repetition of a telecast, rather than negative summary judgment, should be granted where pleadings raise an issue of fact, even if plaintiff's claim of defamation was unsupported as determined by viewing of telecast film.*

8. SAME—TRIAL—INVASION OF PRIVACY.

*A court cannot determine as a matter of law, without record of completed trial, whether repetition of a telecast over objections was privileged or whether it did or did not give rise to a cause for invasion of privacy that may not have existed prior to the time of that telecast.*

9. JUDGMENT—SUMMARY JUDGMENT.

*On motion for summary judgment the inferences to be drawn from underlying facts contained in affidavits, exhibits, and depositions must be viewed in the light most favorable to the party opposing the motion (GCR 1963, 117).*

10. APPEAL AND ERROR—REVIEW OF SUMMARY JUDGMENT—PARTIAL TRIAL.

*Appellate courts must guard against resort to part of record of a mistried jury trial to support a motion for entry of a negative summary judgment (GCR 1963, 117).*

11. PLEADING—SINGLE-COUNT DECLARATION—SUFFICIENCY—INVASION OF PRIVACY.

*Single-count declaration or complaint alleging defamation and invasion of right of privacy because of telecast and repetition of telecast over objection, was sufficient under rules of pleading to state a cause of action for invasion of privacy, without specifically designating such in a second count, particularly where unamended pretrial statement indicated it was part of plaintiff's version with issue of fact for trial.*

12. SAME—DUPLICITY—OBJECTION.

*The objection of duplicity is not good where plaintiff's pleading alleges 2 causes of action in 1 count and one averment does not negative the other, and no objection is made until trial.*

13. JUDGMENT—SUMMARY JUDGMENT—COURTS—COURT RULES.

*A trial judge, sitting on a motion for summary judgment, is under no duty, and possessed of no right, to determine whether a presented, and possibly controlling, issue of fact is creditable, veritable or believable, and is possessed of no authority to enter precipitate judgment upon strength of such conviction or to adjudicate that a possible controlling issue of fact is not genuine (GCR 1963, 117).*

14. SAME—SUMMARY JUDGMENT—CREDIBILITY.

*Court rule which provides for summary judgment if affidavits or other proof submitted show there is no genuine issue of fact does not give judge hearing a motion for summary judg-*

ment the duty or the right to determine credibility of matters
then submitted (GCR 1963, 117).

15. SAME—SUMMARY JUDGMENT—QUESTION FOR TRIER OF FACTS.
Motion for summary judgment should be denied if there is an
issue of fact, and the issue of fact and its attendant, the
credibility of witnesses, should remain for the appointed trier
or triers of fact (GCR 1963, 117).

16. PRIVACY, RIGHT OF—WITHDRAWAL FROM PUBLIC GAZE.
The right to withdraw from the public gaze at such times as
a person may see fit, when his presence in public is not
demanded by any rule of law, is embraced within the right
of personal liberty.

17. SAME—PERSONAL LIBERTY.
Personal liberty embraces the right of publicity and the cor-
relative right of privacy.

18. SAME—WAIVER.
The right of privacy, however, like every other right that rests
in the individual, may be waived by him, or by anyone au-
thorized by him, or by anyone whom the law empowers to
act on his behalf, provided the effect of his waiver will not
be such as to bring before the public those matters of a
purely private nature which express law or public policy
demands shall be kept private.

19. SAME—WAIVER.
Waiver of the right to privacy may be either express or implied,
but the existence of the waiver carries with it the right to an
invasion of privacy only to such an extent as may be legiti-
mately necessary and proper in dealing with the matter which
has brought about the waiver.

20. COSTS—REVERSAL OF SUMMARY JUDGMENT.
Costs are ordered to abide the final result where summary
judgment for defendant is reversed and case is ordered re-
manded.

21. APPEAL AND ERROR—SUMMARY JUDGMENT—RECORD.
Summary judgments of lower courts should be vacated, where
record is not in shape for entry of any kind of peremptory
judgment,

SEPARATE OPINION.

SOURIS, J.

22. LIBEL AND SLANDER—VIEW OF TELECAST FILM—QUESTION FOR TRIER OF FACT.

*Summary judgment for defendant in action for defamation, based on determination that telecast was not defamatory as a matter of law, held, not legally justified where viewing of telecast film by Supreme Court raises question as to whether plaintiff might have been harmed, which judgment should be left for jury determination.*

23. APPEAL AND ERROR—PLEADING—LIBEL AND SLANDER—RIGHT OF PRIVACY.

*Amended complaint alleging only defamation, and so considered by parties in trial court, by trial court, and upon review by Court of Appeals, cannot be viewed by the Supreme Court as a two-count complaint alleging causes of action for defamation and also for invasion of privacy because 2 paragraphs therein contain a suggestion of the latter theory.*

24. SAME—PLEADING—LIBEL AND SLANDER—INVASION OF PRIVACY.

*Single-count complaint alleging only defamation cannot, on review, be considered as alleging an action for invasion of privacy by reason of paragraphs containing a phrase "was false and defamatory and an invasion of his right of privacy," and an allegation that the plaintiff was subjected to "inquisitive notice of the public."*

SEPARATE OPINION.

T. M. KAVANAGH and ADAMS, JJ.

25. TRIAL—MOTION FOR DIRECTED VERDICT—PARTIALLY COMPLETED TRIAL.

*A motion for a directed verdict is not a proper vehicle to determine whether plaintiff's pleadings, exhibits, and witnesses in a partially completed trial raised issues of material fact for determination by a jury.*

26. SAME—MOTION FOR SUMMARY JUDGMENT—INCOMPLETE TRIAL.

*Motion for summary judgment can be utilized to determine whether plaintiff's pleadings, exhibits, and witnesses in an incomplete trial raised issues of material fact for determination by a jury, the actual testimony of witnesses being as acceptable as affidavits for such purpose (GCR 1963, 117).*

27. JUDGMENT—SUMMARY JUDGMENT—QUESTIONS OF FACT.

*Summary judgment may not properly be granted where there are questions of fact for determination by jury (GCR 1963, 117).*

28. NEW TRIAL—PLEADING—LIBEL AND SLANDER—INVASION OF RIGHT OF PRIVACY.

*Causes of action both for libel and invasion of right of privacy were pleaded where plaintiff in single-count complaint indicated that a telecast film was "false and defamatory and an invasion of his right of privacy" and where pretrial statement indicated the case was for "a libel and slander, invasion of privacy action by television"; hence, case should be retried on both theories at new trial.*

29. LIBEL AND SLANDER—TRIAL—QUESTION FOR JURY—TELECAST.

*It is not possible to determine as a matter of law that a telecast is not defamatory as claimed by defendant where a person of similar name is portrayed in a manner which a jury might conclude was rude, arrogant, and unfeeling and where a jury might conclude that the telecast was made with knowledge that the film was false or in reckless disregard of whether it was false or not and that the reputation of the plaintiff was harmed so as to lower him in the esteem of the community and deter third persons from associating or dealing with him.*

30. CONSTITUTIONAL LAW—PRIVILEGED COMMUNICATION.

*Freedom of the press under the First Amendment of the Federal Constitution does not include absolute license to destroy lives or careers.*

31. LIBEL AND SLANDER—INVASION OF PRIVACY—EVIDENCE—QUESTION FOR JURY.

*Evidence presented in action for defamation and invasion of right of privacy through retelecast of film by defendant with knowledge that the film was false or in reckless disregard of whether it was false or not held, to present a question for jury as to whether the reputation of plaintiff had been harmed so as to lower him in the esteem of the community and so as to deter third persons from associating or dealing with him.*

32. SAME—PRIVILEGED COMMUNICATION.

*The availability of the defense of privileged communication in libel actions is tested by the occasion and determined by the court, but each occasion must be viewed in the light of its own facts.*

33. SAME—PRIVILEGED   COMMUNICATION—PUBLIC   FIGURES—PAST
EVENTS.

> The privilege to disseminate current, topical, immediate news of
> public interest or about official or public figures is to be dis-
> tinguished from the privilege to retell past events of possible
> current interest which need not be communicated to the public
> in a matter of hours.

34. SAME—QUALIFIED PRIVILEGE—IMPROPER CONDUCT.

> A limited or qualified privilege to disseminate news may be lost
> through improper conduct.

35. SAME—PRIVILEGED COMMUNICATION—LOSS OF PRIVILEGE—TELE-
CAST—GOOD FAITH.

> To the extent that a telecast film was a reiteration of news and
> magazine articles concerning the donor of a bell to a leper
> colony, it was privileged, the donor having become a public
> figure, but after plaintiff had objected, claiming the film
> deviated falsely from previous accounts, a repetition of the
> telecast raised a question of the lack of good faith deter-
> minable by a jury.

36. PRIVACY, RIGHT OF—INVASION.

> The right of privacy exists, and a person who unreasonably and
> seriously interferes with it is liable in an action for damages.

37. SAME—INVASION OF RIGHT OF PRIVACY.

> The appropriation of a name, picture, or personality giving un-
> justifiable and embarrassing publicity to past facts out of
> a person's life and attributing to him conduct with which he
> cannot fairly be charged is an invasion of the right of privacy.

38. TRIAL—QUESTION FOR JURY—TELECAST—CHARACTER PORTRAYAL.

> A jury is the proper fact finder to determine, from the viewing
> of a telecast film, whether, in its entirety, it was an invasion
> of the right of privacy, taking into consideration not only the
> language of the actor, but also the manner in which he moves
> about, smiles or frowns, and portrays the character whom he
> represents.

39. COSTS—NEW TRIAL—LIBEL AND SLANDER—INVASION OF RIGHT OF
PRIVACY.

> Costs are to abide the final result of new trial granted in action
> for defamation and for invasion of right of privacy.

40. Judgment—Summary Judgment—Court Rules—Sufficiency of Affidavit.

*Moving party for summary judgment need not comply strictly with court rule requiring affidavit to show affirmatively that affiant if sworn as witness could testify competently to facts contained therein, where pleadings, depositions, admissions, and documentary evidence then on file are sufficient to satisfy trial judge that there is no genuine issue as to any material fact (GCR 1963, 116.4, 117).*

41. Same—Summary Judgment—Court Rules—Partially Completed Trial.

*The phrase in the court rule permitting summary judgment specifying depositions, admissions, and documentary evidence then filed in the action or submitted by the parties includes testimony given in a partially completed trial before the same judge who hears the motion for summary judgment, where the parties treat the partially completed trial as supporting their respective positions on the motion, and such items are properly considered by the court in deciding whether there is any genuine issue of fact (GCR 1963, 117.3).*

42. Libel and Slander—Telecast—Accuracy of Details—Malice.

*A television broadcaster is not the insurer of the truth of every quasi-historical dramatic presentation it broadcasts and there is a privilege extended to a broadcaster which will shield it from civil liability for libel in the absence of a positive showing of both falsity and malice.*

43. Same—Sufficiency of Warning against Repetition of Telecast.

*Letter cautioning television station not to repeat telecast but containing no details indicating wherein television film was false or defamatory and containing no indication of how plaintiff was connected with the story portrayed by the film held, insufficient to create obligation of defendant to investigate before re-broadcasting.*

44. Same—Telecast—View of Film—Artistic License.

*Telecast of story, dramatized from condensation of news article, held, after view of television film by Court, not defamatory per se and the minor inaccuracies therein could be countenanced as part of artistic license involved in the presentation of a dramatic work.*

45. TORTS—INVASION OF PRIVACY.

> *Member of family operating ironworks which donated a bell to leper colony and thereby received and accepted publicity through the repetition of the story in various news media, could expect dramatization of the story and cannot now demand seclusion and anonymity.*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., Quinn and Watts, JJ., affirming Wayne, Canham (James N.), J.  Submitted March 8, 1967. (Calendar No. 8, Docket No. 51,384.)  Decided October 2, 1967.

2 Mich App 74, reversed.

Declaration by Franz J. Weeren against Evening News Association, a Michigan corporation, Reader's Digest Association, a foreign corporation, and National Broadcasting Company, a foreign corporation, for damages sustained by the showing of an allegedly defamatory television film.  Service of process quashed and case dismissed as to defendant Reader's Digest Association.  Discontinued without prejudice as to defendant National Broadcasting Company.  Summary judgment for defendant Evening News Association.  Judgment affirmed by Court of Appeals.  Plaintiff appeals.  Reversed and remanded for trial.

*Kelman, Loria, Downing & Craig (George L. Downing,* of counsel) for plaintiff.

*Vandeveer, Haggerty, Doelle, Garzia, Tonkin & Kerr (Buell Doelle,* of counsel) for defendant.

BLACK, J.  Like the three *Durant Cases*[1] this is another tort action where summary action below

[1] *Durant* v. *Stahlin (Appeal in re King, Bashara, Merrell, and Waldron),* 374 Mich 82; *Durant* v. *Stahlin (Appeal in re Van Dusen,*

has divided the Court—hopelessly and inconclusively. Again the rock that trisects the stream of judgment is that importation from the Federal system known as accelerated or summary judgment, found in GCR 1963, 116, 117. The supporters of quick and easy riddance of politically troublesome cases will not even recognize—in fact have steadily ignored since Rules 116 and 117 became effective—what seem to be the supremely controlling pilot-directors of the aforesaid importation, referring specifically to *Sonnentheil* v. *Christian Moerlein Brewing Company*, 172 US 401 (19 S Ct 233, 43 L ed 492); *Sartor* v. *Arkansas Natural Gas Corporation*, 321 US 620 (64 S Ct 724, 88 L ed 967); *Poller* v. *Columbia Broadcasting System, Inc.*, 368 US 464 (82 S Ct 486, 7 L ed 2d 458); and *United States* v. *Diebold, Inc.*, 369 US 654 (82 S Ct 993, 8 L ed 2d 176), all having been relied upon in the prevailing opinion of the first *Durant Case* (374 Mich at 88–91), wherein summary judgment was denied. Meanwhile others acknowledging that the four cited Federal decisions do exist, were unwilling to apply them to the second and third *Durant Cases* (see Souris, J., 375 Mich at 647–650 and at 666). The curious result was that misfortunate defendants King, Bashara, Merrell and Waldron were held for trial on *denial* of summary judgment (374 Mich 82) while the more favored defendants McKeehan (374 Mich 93), Van Dusen, Elliott, Romney (375 Mich 628) and Brucker (375 Mich 665) were let out on *grant* of summary judgment.

All this took place in the same action with all defendants correspondingly charged with a libel of the plaintiff or actionable participation in such libel.[2] It must be that Rules 116 and 117, wrought

*Elliott, Romney)*, 375 Mich 628; *Durant* v. *Stahlin (Appeal in re Brucker)*, 375 Mich 665.

[2] Some of that "New Legality" of which we are now being told

supposedly by and upon the Court's own hammer
and anvil, are mighty abstruse when not even 5
Justices can agree upon any dependable guide for
application of those rules to actions for tort that
are based upon the common law and depend upon
testimonial proof and the legal sufficiency of such
proof.

Had Professor Rodell been seated here for judg-
ment as the 3 *Durant Cases* came up, I am sure he
would have hatched a cyclic new killy-loo for appli-
cation of Rules 116 and 117, a legal bird with left
and right wings arranged reversibly so that all
flight might go round and about rather than just
backward. The reference appears in *Williams* v.
*City of Detroit*, 364 Mich 231, 276, 277. To quote
Rodell again:

" 'The law is the killy-loo bird of the sciences.
The killy-loo, of course, was the bird that insisted
on flying backward because it didn't care where it
was going but was mightily interested in where it
had been. And certainly The Law, when it moves
at all, does so by flapping clumsily and uncertainly
along, with its eye unswervingly glued on what lies
behind.' Rodell, 'Woe Unto You, Lawyers!', ch 2,

must have been at work when the second and third *Durant Cases*
came up. See the Touchy presentation of this clarion arouser, and
consider the stirring conclusion thereof (53 ABAJ, June 1967; pp
544, 546):

"The concept of the new legality has not run its course. In order
to achieve justice for all of the citizens of the United States, the
proponents of the new legality believe that the concept must be carried
down to the lowest court. It is not acceptable for the inferior courts
to mete out injustice or to continue to enforce principles that are
unjust or unfair and must be corrected on appeal. The trial courts,
in which the majority of the citizens either achieve justice or are
deprived of it, must decide the case at hand on the principles of the
new legality. In other words, they must see that a just result is
reached then and there; no longer can they excuse their decisions be-
cause they are bound by rulings from higher courts. They must
take the example of the Supreme Court of the United States, which
does not consider itself bound by precedent. They must decide the
real issues at hand and render a just decision."

p 23, Reynal & Hitchcock, p 20, Pageant Press, Inc.,
New York City."

Since submission of this appeal, seven of us have
seen and heard the telecast "A Bell for Okinawa."[3]
Contrary to probative opinion reached upon read-
ing the cold print of appendix and briefs, that audio-
visual review has brought the writer to definite
agreement with defense counsel that the telecast
discloses no actionable defamation of plaintiff and
that *Nuyen* v. *Slater,* 372 Mich 654, affirming grant
of summary judgment, controls that point as a
matter of law.   Like the letter written by Mrs.
Slater to the State health department, nothing con-
veyed to eye and ear by the film "defamed plaintiff
within the commonly accepted meaning of the word.
See 3 Restatement, Torts § 559." (SOURIS, J., writ-
ing for the majority in *Nuyen,* p 662).

So much, then, for plaintiff's claim that he is
possessed of a cause for defamation.   But another
question, not answerable by demonstrative or docu-
mentary proof alone, remains for due process test
of defendant's motion for summary judgment.   Such
question depends for answer upon that which may
indeed be proved but yet is not; referring specifi-
cally to defendant's key defense which, under head-
ing "affirmative defenses," is designated in its an-
swer as paragraph (7).   Paragraph 7 reads:

"(7) Plaintiff, while in Germany, acted to pre-
empt the limelight as a public figure, or a celebrity,
or a public personage, and, consequently, he lost
his right to privacy, since: (i) he himself sought
publicity and consented to it, and so he cannot now
complain of such publicity; (ii) his personality and
affairs already had become public, and these can

---

[3] This was done successively in the courts below by agreement of
the parties.   We in turn, the parties stipulating agreeably, accept the
film and its audio-visual presentation as a document forming part
of defendant's motion for summary judgment.   See GCR 1963, 117.3.

no longer be regarded as his own private business; and, (iii) television, in common with the press, has a privilege, guaranteed by the United States and Michigan Constitutions, to inform the public about those who have become legitimate matters of public interest".[4]

One need but add that the affirmative defense thus pleaded may—if supported by due proof—turn out to be airtight as a matter of law. On that score see the respective opinions of *Curtis Publishing Company* v. *Butts* (*Associated Press* v. *Walker*), 388 US 130 (87 S Ct 1975, 18 L ed 2d 1094), so far as such opinions deal with General Walker's *fully tried* case. But the validity of that defense may be rightfully tested only at close of *all* proofs, and then by motion for an instructed negative verdict as done in both *Butts* and *Walker*. As yet it has not received that exact proof-bolster which ever must precede determination of a cause by judicial judgment distinguished from jury verdict.

Upon the procedurally restricted showing now before the Court I hold that plaintiff's cause as pleaded cannot be tested for legal sufficiency until, in the course of a due and complete trial, both parties have submitted proof for and against the proposition that the defendant telecaster actionably invaded his "right to be let alone" by repeating the telecast after having received from plaintiff the latter's cease and desist letter of May 7, 1958. In such regard we find that plaintiff has alleged in his declaration, and defendant has not denied, that:

"13. Plaintiff immediately, through attorneys, caused a letter to be sent to the defendant requesting that defendant cease and desist from further

---

[4] Compare these pleaded asseverations with the reasoning and result of *Spahn* v. *Messner*, 18 NY2d 324 (221 NE2d 543) (remanded for further consideration, *Messner* v. *Spahn*, 387 US 239 (87 S Ct 1706, 18 L ed 2d 744).

distribution and telecast of said film and advising the defendant that said film was false and defamatory and an invasion of his right of privacy.

"14. Notwithstanding receipt by defendant of this letter the defendant did again, recklessly and without the knowledge or consent of plaintiff, telecast said film on or about September 2, 1958."

Thus far we are referred to nothing, nothing of record at all, which might tend to explain or justify defendant's going on with the second telecast or, possibly, tend to show an "adequate" investigation, after receipt of the cease and desist letter, upon strength of which defendant may have become immune legally from plaintiff's charge of actionable invasion. There may indeed be such an explanation or justification. Defendant may have investigated to such extent as would satisfy the requirements of acceptable publishing standards. But that we do not yet know and will not know until defendant undertakes its quoted defense, a defense which would seem to require exemptive proof, not allegation, that defendant in proceeding with the second telecast did not depart from such standards. To quote that part of the Court's opinion which, in *Curtis Publishing Co.* v. *Butts,* pp 158, 159, concluded the *Walker Case:*

"In contrast to the *Butts* article, the dispatch which concerns us in *Walker* was news which required immediate dissemination. The Associated Press received the information from a correspondent who was present at the scene of the events and gave every indication of being trustworthy and competent. His dispatches in this instance, with one minor exception, were internally consistent and would not have seemed unreasonable to one familiar with General Walker's prior publicized statements on the underlying controversy. Considering the necessity for rapid dissemination, nothing in this

series of events gives the slightest hint of a severe
departure from accepted publishing standards. We
therefore conclude that General Walker should not
be entitled to damages from the Associated Press."

With plaintiff's claim of defamation out of this
case as a matter of law, the briefed question of
privilege—qualified or unqualified—takes on a not
yet fully explored aspect of legal substance. Nei-
ther of the courts below has considered the question
of privilege excepting as it applies in the context
of plaintiff's said allegation of defamation. Hence
the controlling question on present appeal is wheth-
er, as against defendant's motion for summary
judgment,[5] plaintiff is entitled to that kind of a trial
our own Constitution supposedly assures,[6] before
the trial judge may hear and determine any motion
for entry of a negative judgment. I stand for such
a trial and therefore vote to reverse this latest order
granting summary judgment, the finally assigned
merit of which is that there is no "genuine" issue of
fact. As for that adjective "genuine", see dissent-
ing comment in *Coronet Development Company* v.
*F. S. W., Inc.,* 379 Mich 302, 314, 315.

The trial judge filed two opinions. Each upheld
defendant's said motion. In his first opinion the

[5] That motion alone with affidavits for and against plus the stipu-
lated appraisal by all 3 courts of "A Bell for Okinawa." Such was
the properly exclusive record upon which the trial judge based his
decision. See contextual quotation of the judge's second opinion,
*post.*

[6] "With the arrival of this appeal there remains but little, doubt
that our fancy new rules of peremptory practice are being regularly
employed—subtly and effectively—to circumvent the revered and
hitherto guaranteed right to have presented issues of fact tried to and
decided by juries. For attestation of such right, as it was in the be-
ginning, is now, but—if current sly schemers do have their way—
will never hence be, see United States Const Am 7; Mich Const
(1850), art 6, § 27; Mich Const (1908), art 2, § 13 (duplicating
the 1850 guaranty); *Underwood* v. *People,* 32 Mich 1 (20 Am Rep
633); *Swart* v. *Kimball,* 43 Mich 443; *Paul* v. *Detroit,* 32 Mich 108;
*Risser* v. *Hoyt,* 53 Mich 185." (*Romero* v. *King,* 368 Mich 45, 49,
50.)

judge declared his view of the decisive question of law this way:

"Here the defendant, Evening News Association, has moved for a summary judgment for a myriad of reasons which may be reduced, however, to one simple statement as follows: They move for the summary judgment because they state the defendant, as a visual broadcaster, is exempt from liability for defamation by reason of a qualified privilege absent malice."

On motion for reconsideration the trial judge found that the film televised by defendant "is not defamatory as a matter of law of any of the characters it depicts." Agreeing that that was and is true, there was and now is no question of privilege for judicial consideration excepting as that question may apply to plaintiff's claim that his right of privacy was actionably invaded. The issue then became whether, both in circuit and upon submission to the seated panel of the Court of Appeals, plaintiff's cause was determinable properly "on the pleadings as augmented by the exhibit of the published article and the film itself." The quotation is taken from the concluding paragraph of the trial judge's opinion on motion for reconsideration. The full paragraph reads:

"This court, in finding that defendant was qualifiedly privileged in televising the film, also finds as a matter of law that the film and its published prototype were in substantial and material agreement, considering what we must recognize as limitations of photography in depicting the written word, and without allegation of express malice in such televising, defendant Evening News Association, as the television station disseminating the film, is entitled to summary judgment of no cause of action on the pleadings as augmented by the exhibit of the published article and the film itself."

Plaintiff's cause arose, if at all, in 1958. It was tried to the point of mistrial in June of 1963. At and prior to the time of mistrial the law of privacy was fitful if not downright enigmatic. One judge, with manifest justification back in 1956, likened it to a "haystack in a hurricane" (*Ettore* v. *Philco Television Broadcasting Corporation* [CA 3], 229 F2d 481 [58 ALR2d 626]).[7] But that dubious situation in our jurisprudence was as nothing, now that 1967 and *Time* v. *Hill,* 385 US 374 (87 S Ct 534, 17 L ed 2d 456) have arrived. *Time* v. *Hill* suggests imperatively that the intrusion of constitutional questions into the action for invasion of privacy requires of the courts of the States that they develop their precedents of substance only when the facts, the all important facts, are completely and testimonially assembled before the trial judge and trial jury (where as here one of the parties has preserved his right of trial by jury).

One need but read, thoughtfully, "Privacy: The Right to be Let Alone," by Ernst and Schwartz, The Macmillan Company, 1962; the complete symposium "Privacy" appearing in the Spring 1966 issue of Duke University's Law and Contemporary Problems (No. 2); Professor Bloustein's "Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser" (September 1966 issue of Publishing Entertainment Advertising Law Quarterly, p 166); Mr. Silver's "Privacy and the First Amendment", written for the May 1966 issue of Fordham Law Review, No. 4, p 553; Mr. Goldstein's "The Constitutional Rights of Privacy—'A Sizable Hunk of Liberty' ", written for the Summer 1966 issue of

---

[7] "The state of the law is still that of a haystack in a hurricane but certain words and phrases stick out. We read of the right of privacy, of invasion of property rights, of breach of contract, of equitable servitude, of unfair competition; and there are even suggestions of unjust enrichment." (p 485.)

Maryland Law Review, p 249; and Mr. Rodgers' "A New Era for Privacy", written for the Winter 1967 issue of North Dakota Law Review, p 253, to conclude that judicial consideration of most if not all of the legal and constitutional questions arising from an asserted cause for invasion of privacy should not be undertaken until all of the circumstances of such asserted cause have been marshaled and presented in the course of trial.

Let us examine *Time* v. *Hill* for verification of this, after having considered the prescient first paragraph of Mr. Silver's mentioned article:

"In *New York Times Co.* v. *Sullivan,* the United States Supreme Court held that State tort law and its judicial enforcement is 'State action' within the Fourteenth Amendment. Thus, where such law unduly interferes with freedom of speech or press under the First Amendment, it cannot be enforced.

"Although the *Times Case* arose out of a libel suit, there can be no doubt that any tort or other action cognizable in State courts will be subject to future constitutional test. The next tort action to undergo constitutional scrutiny will undoubtedly be that of invasion of privacy. Indeed, the Supreme Court has recently accepted a privacy case arising out of a judgment awarded to an individual publicized in Life magazine. As the Court stands poised at the brink of entry into yet another State domain, it would be propitious to clearly understand the problems posed by the present law of privacy and the possible resolutions to these problems."[8]

Three features of *Time* v. *Hill* stand forth as of today's stage of that yet unsettled case.

---

[8] Mr. Silver's references at the time (May, 1966) were to *New York Times Co.* v. *Sullivan,* 376 US 254 (84 S Ct 710, 11 L ed 2d 686, 95 ALR2d 1412) and to *Hill* v. *Hayes,* 18 App Div 2d 485 (240 NYS2d 286), affirmed memorandum, 15 NY2d 986 (207 NE2d 604, 260 NYS2d 7).

The first and most important is that the case was tried to jury verdict and entry of judgment; that the verdict as to liability was sustained below and reversed by the Supreme Court, and that reversal was *not* for entry of judgment in favor of the defendant but for retrial, the Court having found (385 US at 391):

"Turning to the facts of the present case, the proofs reasonably would support either a jury finding of innocent or merely negligent misstatement by Life, or a finding that Life portrayed the play as a re-enactment of the Hill family's experience reckless of the truth or with actual knowledge that the portrayal was false."

The next is that two members of the Court found it necessary to join three other members *provisionally* "in order for the Court to be able at this time to agree on an opinion in this important case based on the prevailing constitutional doctrine expressed in *New York Times Co.* v. *Sullivan,* 376 US 254."[9] (Quotation from Mr. Justice Black's separate opinion, p 398.)

The last, drawn from the first two, is that the Court simply could not have approached the writing of any opinion or opinions of substance for the case on strength of summary judgment procedures. Far from being a precedent for summary disposition of an action for invasion of privacy, *Time* v. *Hill* stands as a unanimous determination that Hill's cause as alleged and tried should be retried, reversible error having been discovered in the trial judge's charge to the jury.

Now for the case at bar:  Without the record of a completed trial, how may this Court decide as a matter of law that the defendant enjoyed some

---

[9] This happened again in *Curtis Publishing Co.* v. *Butts, supra.* See the opinion of Mr. Justice Black, 388 US at 170.

legal privilege to deliver the second telecast? How may the Court determine, again as a matter of law, that the circumstances of the second telecast did or did not give rise to a cause for invasion of privacy, a cause that may not have existed prior to the time of that telecast? For answer consider what is before the Court at present writing.

Three opinions of this case have been submitted for signature. One, prepared by Justice Brennan, stands for affirmance. Another, prepared by Justice Souris, stands for reversal on ground that the question of defamation only is a triable issue of fact, it being his view that plaintiff has failed to plead a cause for invasion of privacy. I am unable to sign either opinion; hence this separate contribution.

1. *The* Brennan *Opinion.*

This opinion goes so far as to make up a finding of facts on the unique if not virginal assumption that the Court is armed with authority not only to try Mr. Weeren's case on merit but to determine it upon findings of fact and conclusions of law as in GCR 1963, 517 provided. These findings enter our record under the unabashed declaration that "we must now tell the story of Franz J. Weeren against the Evening News Association as it can be gleaned from the words of Mr. Weeren himself and the uncontroverted exhibits, documents and pleadings in the cause." Then comes "the story," told with factual selections about as unfavorable to the plaintiff's cause as one reasonably might expect in the course of a defensive jury argument, even unto histrionic demand for outright discard of plaintiff's cease and desist letter of May 7, 1958, as having fallen "short of the mark" (the "mark" not being identified either by citation or proof).

Marked definitely by the advent of *United States v. Diebold, Inc.*, 369 US 654 (82 S Ct 993, 8 L ed 2d 176),[10] the instant duty of this Court would seem to be the other way around, no court as yet—circuit, appellate, or Supreme—having been authorized to test more than defendant's motion for summary judgment. *Diebold* says, at 655:

"On summary judgment the inferences to be drawn from the underlying facts contained in such materials ["affidavits, attached exhibits, and depositions submitted below"] must be viewed in the light most favorable to the party opposing the motion. A study of the record in this light leads us to believe that inferences contrary to those drawn by the trial court might be permissible. The materials before the district court having thus raised a genuine issue as to ultimate facts material to the rule of *International Shoe Company* v. *Federal Trade Commission* [280 US 291 (50 S Ct 89, 74 L ed 431)], it was improper for the district court to decide the applicability of the rule on a motion for summary judgment. Fed Rules Civ Proc, 56(c)."

To the credit of both, neither the trial judge nor the panel below undertook any such findings of fact or unfavorable-to-plaintiff forensics. For the trial judge's restriction of decision to the question of privilege, determinable solely "on the pleadings as augmented by the exhibit of the published article and the film itself," see the concluding paragraph of his second and final opinion, quoted *ante*. As for the appellate panel, the judges there disposed of plaintiff's appeal strictly on strength "of the pleadings, film and article on which the film was based" and proceeded to hold that defendant's do-

---

10 In *Diebold* the Court considered the Federal rule from whence our Rules 116 and 117 were copied in near verbatim substance. Summary judgment was, of course, denied.

.ings were privileged as a matter of law, "that there was no showing of material falsity or malice," and that there could be no claim "of excessive publication." (2 Mich App at 77.) No resort to the incomplete record of testimony was attempted, the panel understanding properly that there was presented before it the validity of a motion for summary judgment only; certainly no duty to weigh incomplete proof, find facts, and determine the merits of the pleaded cause and the pleaded affirmative defenses.

2. *The* SOURIS *Opinion.*

Justice SOURIS, looking upon plaintiff's complaint as failing to allege a cause for invasion of privacy, alleges that "at this late date" the Court should not "treat it as if it were a two-count complaint alleging causes of action for defamation and also for invasion of privacy." I reply that there is no need for consideration of such treatment, the complaint being amply sufficient under our rules of "notice pleading." Indeed, as early as the time for answer the defendant knew that it was called upon for response to a combined complaint for defamation and invasion of privacy, both theories of recovery having arisen from the same set of facts as pleaded. Witness paragraph (7) of its answer, quoted above, pleading specially defendant's reasons for defending against the second theory on ground that plaintiff had "lost his right to privacy." Consider next the applicable rule as related in *McDonald* v. *Hall,* 193 Mich 50, 53, 54:

"When a single and continuous purpose runs through an entire transaction made up of various acts, each of which might alone constitute a cause of action, it is proper to set out all the facts in one count as a single cause of action. 31 Cyc, p 119, and cases cited in note."

So far as concerns Justice Souris' criticism that the complaint is not in two-count form, he is the first to raise that point. The date for insisting on such hyperelegant pleading really is too late. See *Douglas* v. *Marsh,* 141 Mich 209, 213, 214, reading:

"It will be noted that the objection made was not that there was any technical failure to aver sufficient facts to establish a liability on the part of the defendant as owner, but the distinct point ruled was that the declaration, being in the alternative, was too uncertain in its statement to sustain a verdict. It is the settled rule that duplicity in a count cannot be made the subject of objection at the trial, but should be made the subject of special demurrer. 7 Encyclopedia Pleading & Practice pp 243, 244. See, also, *Fuller* v. *City of Jackson,* 82 Mich 480. It would have been better pleading to set out the two possible theories in separate counts; but unless the one averment negatives the other, the objection of duplicity was not good";

and this concurring passage of *Kruk* v. *Minneapolis, St. Paul & Sault Ste. Marie R. Co.,* 249 Mich 685, 689:

"The cause of action for negligence undoubtedly was inconsistent with the charge under the hazardous employment act. The former was based upon the relation of master and servant, and the latter on the theory that the relation did not exist. Circuit Court Rule No 21, § 7 [1919],[11] permits the joining of inconsistent causes of action in a declaration, but requires that they be charged in separate counts. The second count violated this rule. The defect, however, was in form, not in substance. It should have been challenged by motion in the nature of special demurrer, and was waived by pleading the general issue. *Douglas* v. *Marsh,* 141 Mich 209; 31 Cyc, pp 277, 278, 719."

[11] 2 Cummins & Beecher, Michigan Judicature Act (2d ed), p 1711, —REPORTER.

SUMMARY

*First:* There is no precedent for the adjective posture of this case as some of the Brethren view it. Considering the process that is due, nothing beyond a judgment of remand with instructions is in order. It is a fact that, prior to trial, no one regarded the case as one for summary judgment on defendant's motion, or as one due other than for trial of the fact and law issues of defamation and invasion of privacy. The unamended pretrial statement subscribed by Judge Wise records, under "Plaintiff's version":

"This is the case of the Bell for Okinawa. It is a libel and slander, invasion of privacy action by television."

Under "Defendant's version" defendant set forth its "summarized defenses," suggesting nowhere that plaintiff had not pleaded a combined cause as thus averred by plaintiff. Then, under "Issues," Judge Wise inserted the words "issues of fact and law."

Under and in accordance with these auspices of pleading and pretrial procedure the trial went on some 7 days to the point of declared mistrial. Resort to GCR 1963, 117 was not attempted until after the trial had proceeded to such point. Then the only affidavit offered in support of summary judgment was that of defendant's counsel. It contained no facts such as would be admissible in evidence to establish the grounds stated in the motion. That seems to be pretty much conceded. Nonetheless, and despite the fact that both courts below were careful *not* to depend upon the incomplete testimonial record to bolster either the motion or the respective opinions of such courts, some here would have the court extend summary judgment practice so that one failing to move under the rule

until the cause has been partly tried may then move for summary judgment on whole or partial strength of such incomplete trial and obtain, at that stage, the equivalent of an instructed negative verdict and consequent negative judgment.

This is not all. Until the record below arrived in this Court, defense counsel refused to recognize any part of the transcript of the trial as rightfully supporting his motion for summary judgment. To quote from defendant's brief as submitted to the Court of Appeals:

"Counsel for appellant has printed what he deems to be favorable excerpts from the transcript of a lengthy trial under the optional provision of appellate rules, GCR 1963, 800.12(1), which permits him, in a case originally filed in the Supreme Court, to use either an appendix or transcript.

"The trial evidence, however, is not a proper part of this appeal, since Judge Canham, in giving his opinion on reconsideration of the motion, specifically stated that he had 'considered pleadings on file in this Court with attached exhibits and two viewings of the film.'"

It may be that the writer has gone into too much detail here; detail purposed toward full exposure of what the record discloses is total unemployability at present of Rule 117. But that has been deemed necessary, the better to guard against the possibility of impression that this Court is getting ready to sanction *resort to part of the record of a mistried jury trial* for support of a motion under Rule 117 for entry of a negative judgment.

*Second:* It is no secret now, the three *Durant Cases* considered (374 Mich 82; 375 Mich 628; 375 Mich 665), that the profession and bench of Michigan are groping for some, any, degree of certainty for ascertainment of the circumstances under which

motions for summary judgment in tort actions are
grantable properly. The uncritical reliance in some
of the *Durant* opinions, upon that qualifying adjec-
tive "genuine" (see GCR 1963, 117.3), has left too
many lawyers with erroneous impression that the
trial judge presiding is under duty—and therefore
possessed of right—to determine whether any pre-
sented and possibly controlling issue of fact is cred-
itable, veritable, legitimate or, indeed believable
by any jury the court might select. True, the judge
may believe nothing set forth in an affidavit or
deposition offered for or against summary judg-
ment; he may even convince himself that the affiant
is either lying or mistaken. He is nevertheless pos-
sessed of no authority to enter precipitate judgment
upon strength of such conviction or to adjudicate
that a possibly controlling issue of fact made by
affidavit or deposition is not "genuine." He sits
in the same position as on motion for an instructed
verdict. If there is an issue of fact, "genuine" or
not, to him, the motion must be denied. The issue
of fact and its attendant, the credibility of wit-
nesses, remains for the appointed trier or triers of
fact. That was made clear in the first *Durant Case,*
374 Mich at 89, 90 (citing the *Sartor* and *Sonnentheil
Cases*)[12] and later by Justice Souris in the second
*Durant Case,* 375 Mich at 651, 652 (citing the same
cases).

*Third:* Probably the decision cited oftenest thus
far in privacy cases is *Pavesich* v. *New England
Life Insurance Co.,* 122 Ga 190 (50 SE 68, 69 ALR
101, 2 Ann Cas 561, 106 Am St Rep 104). As
other writers in this field have done,[13] the opinion

---

[12] *Sartor* v. *Arkansas Natural Gas Corporation,* 321 US 620 (64 S
Ct 724, 88 L ed 967); *Sonnentheil* v. *Christian Moerlein Brewing
Company,* 172 US 401 (19 S Ct 233, 43 L ed 492).—Reporter.

[13] Notably Ernst and Schwartz, *supra* at 49. They say:
"Thomas M. Cooley was the author of The Elements of Torts, pub-

of the court properly credits our Justice COOLEY with having originally declared that the specific essence of the right of privacy is "the right of the individual to be let alone." For the convenience of those who may wish to pursue the subject in general, these seemingly dependable quotations from *Pavesich* are appended:

"The right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by any rule of law, is also embraced within the right of personal liberty. Publicity in one instance, and privacy in the other, are each guaranteed. If personal liberty embraces the right of publicity, it no less embraces the correlative right of privacy, and this is no new idea in Georgia law. In *Wallace* v. *Georgia C. & N. R. Co.*, 94 Ga 732 (22 SE 579), it was said: 'Liberty of speech and of writing is secured by the constitution, and incident thereto is the correlative liberty of silence, not less important nor less sacred.' The right of privacy within certain limits is a right derived from natural law, recognized by the principles of municipal law, and guaranteed to persons in this State both by the Constitutions of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law." (122 Ga 196, 197 [50 SE 70, 71].)

"The right of privacy, however, like every other right that rests in the individual, may be waived by him, or by any one authorized by him, or by any one whom the law empowers to act in his behalf, provided the effect of his waiver will not be such as to bring before the public those matters of a purely private nature which express law or public

---

lished in 1878. There, of personal immunity, he says: 'The right to one's person may be said to be *a right to be let alone.*' This seems to be an instance where the definition for a word precedes the word itself."

policy demands shall be kept private. This waiver may be either express or implied, but the existence of the waiver carries with it the right to an invasion of privacy only to such an extent as may be legitimately necessary and proper in dealing with the matter which has brought about the waiver. It may be waived for one purpose, and still asserted for another; it may be waived in behalf of one class, and retained as against another class; it may be waived as to one individual, and retained as against all other persons." (122 Ga 199 [50 SE 72].)[14]

Let me repeat, from the above, that "Liberty of speech and of writing is secured by the Constitution, and incident thereto is the correlative liberty of silence, not less important nor less sacred." Now that liberty of speech and press have been thrust nationally into the right of action for defamation if not directly into the right of action for invasion of privacy (but see *Warren Spahn's Case, supra*), it is a blind appellate court that cannot foresee injection into cases as at bar of that correlative right to be let alone which, in *Pavesich,* came to consideration and approval. This of course implies no present decision or conviction either way. It does say, right out, that all such questions should be considered by appellate courts only in the light of fully tried—not summarily truncated—actions for damages. It says also that if fully tried cases like *Time* v. *Hill, Messner* v. *Spahn* and *Curtis Publishing Co.* v. *Butts* were too sticky and inconclusive for entry of final judgment, this summarily judged case is too much so for present entry of such a judgment.

---

[14] As one reads contemplatively through the cases and reviews dealing with the right of action for invasion of privacy, it comes to him more and more that the defense (where there is a defense and a defense is needed) is regarded as a *waiver* by the plaintiff of his asserted right, not a *privilege* of the defendant to intrude upon or disturb that right.

Needless to say, the views set forth in this opinion are expressed solely within the procedurally circumscribed context of defendant's summary motion and of our inquiry into the validity of that motion. No "logical extensions" thereof are permitted. See *Larzelere* v. *Starkweather,* 38 Mich 96, 101, *McNally* v. *Board of Canvassers of Wayne County,* 316 Mich 551, 558, and quotation of Chief Justice Marshall in *Humphrey's Executor (Rathbun)* v. *United States,* 295 US 602, 627 (55 S Ct 869, 79 L ed 1611). The quotation was taken from *Cohens* v. *Virginia,* 19 US (6 Wheat) 264, 399 (5 L ed 257).

As noted above, my vote is cast to reverse and for remand to circuit for entry of order denying this motion for summary judgment. All costs should abide the final result.

SUPPLEMENT (September 25, 1967):

Refer to page 494 above, noting the then fact of submission of *three* opinions of this case, each variant from both of the others. There are *four* opinions now, Justice ADAMS having contributed September 21st a third view for reversal.

Looking at these circumstances of judicial paralysis, it is not out of order to observe that the profession as well as the case would be served better by scrapping all four opinions followed by entry of an order vacating both judgments below for reason that the record is not presently in shape for entry of any kind of peremptory judgment.

SOURIS, J. *(concurring in reversal and remand for trial).* I cannot subscribe Mr. Justice BRENNAN's opinion for affirmance but, instead, for reasons to be stated, I vote for reversal and remand for trial.

Summary disposition of plaintiff's defamation claim because the televised film "is not defamatory as a matter of law", as the circuit judge concluded

on reconsideration of the motion for summary judgment,[*] was not legally justified. Justice BRENNAN accurately states, at p 522 of his opinion, *infra,* the plaintiff's allegations regarding his claim that the film was defamatory. Having viewed the film, I am not prepared to join in any judgment which, *as a matter of law,* holds that the film did *not* tend "so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." The quoted language is from 3 Restatement, Torts, § 559, adopted by this Court, as the commonly accepted meaning of the word "defamation", in *Nuyen* v. *Slater* (1964), 372 Mich 654, 662. Such judgment should be left for factual determination by a jury.

Plaintiff's amended complaint, as I read it and as it was read by the parties themselves in the trial court, by the circuit judge, and by the Court of Appeals, purports to allege a cause of action only for defamation. Its 15 numbered paragraphs, comprising a single count, set forth allegations of fact appropriate for, and typical of, a defamation cause. Only in two paragraphs is there any suggestion of a claim by plaintiff that defendant's action invaded his privacy. In one, the suggestion appears in his factual recital that a letter was sent by his attorneys to defendant requesting that it cease and desist from rebroadcasting the television film because it "was false and defamatory and an invasion of his right of privacy." In the other, plaintiff simply alleged that the conduct of the defendant not only defamed him, but also subjected him to "inquisitive notice of the public." Considering the contents and form of the amended complaint, and the way in which the parties themselves and the judges who heretofore have passed upon it have construed it, I do

_____
[*] See GCR 1963, 117.—REPORTER.

not believe that at this late date we should treat it as if it were a two-count complaint alleging causes of action for defamation and also for invasion of privacy.

I cast my vote to reverse the circuit judge's summary judgment and to remand for trial of the defamation cause alleged in plaintiff's amended complaint, not for trial of an invasion of privacy cause. Plaintiff should be allowed to tax his costs.

ADAMS, J. (*concurring in reversal and remand for trial*). I agree with Justice BLACK that this case should be remanded with instructions in order that the trial judge may have proper guidance as he proceeds with a trial.

### I. THE MOTION FOR SUMMARY JUDGMENT.

Normally the time for a motion for summary judgment is before trial. In this case, a trial was begun. After seven days, it ended in a mistrial. The plaintiff's last witness was on the stand at the time. The clear purpose of defendant's motion was to test plaintiff's entire case. This is disclosed in the first paragraph of the motion:

"Defendant * * * moves the court to enter summary judgment for defendant * * * for the reasons that the pleadings heretofore filed in the above action, *as well as the earlier and nearly completed trial of the cause on the merits* before this court and a jury, disclose that there is no genuine issue as to any material fact." (Emphasis supplied.)

Defendant could not test plaintiff's practically completed case by a motion for directed verdict. Under the circumstances, the motion for summary judgment could be utilized to determine whether plaintiff's pleadings, exhibits, and witnesses had raised

genuine issues of material fact for determination by the jury. Certainly the actual testimony of plaintiff's witnesses should be as acceptable for this purpose as affidavits. GCR 1963, 117. Since plaintiff's case was incomplete, he could, in opposing the motion, have filed counter affidavits.[1]

While the motion for entry of summary judgment was properly made, in my view there were numerous questions of fact for determination by the jury and, consequently, it was error to grant same.

## II. DID THE PLAINTIFF PLEAD (1) DEFAMATION BY LIBEL AND (2) INVASION OF PRIVACY?

Causes of action based upon a claim of libel and a claim of invasion of privacy were pled. The defendant was advised by letter from plaintiff's attorneys immediately after the first showing of the film that plaintiff's right of privacy had been invaded.[2] The claim was reiterated in paragraph 13 of plaintiff's "amended complaint and declaration."[3] The claim was stated by the pretrial judge in the pretrial statement.[4] The claim is again made in subparagraph (h) of the plaintiff's motion for new trial and rehearing on motion for summary judgment.[5] Finally, since the case must go back, the

---

[1] It may be further noted that, upon inquiry from this Court, the attorneys for both plaintiff and defendant stated it was their desire that this Court consider the entire record in its determination of the issues presented.

[2] "The characterization of Mr. Weeren and representation of his actions and conduct are regarded as false, defamatory and an invasion of his right of privacy."—From letter by plaintiff's attorneys to defendant.

[3] "13. Plaintiff immediately, through attorneys, caused a letter to be sent to the defendant requesting that defendant cease and desist from further distribution and telecast of said film and advising the defendant that said film was false and dafamatory and an invasion of his right of privacy."

[4] "This is the case of the Bell for Okinawa. It is a libel and slander, invasion of privacy action by television."

[5] "(h) that this Court erred in holding as a matter of law that

plaintiff should be allowed to go to trial upon both theories even if it is necessary to amend the complaint. GCR 1963, 118.1, 118.4. *LaBar* v. *Cooper* (1965), 376 Mich 401.

### III. Was the Film Nondefamatory as a Matter of Law?

I agree with Justice Souris that it is not possible to determine as a matter of law that "A Bell for Okinawa" is nondefamatory. Plaintiff's amended complaint and declaration alleged:

"10. The film as produced and telecast by defendant used plaintiff's name and identified him with said Neukollin Eisenwerk and falsely characterized and portrayed him by name as an arrogant, unfeeling person, and as possessing a character universally associated with the Hitler Nazi party.

"11. The film as telecast further asserted that plaintiff was approached by Dr. von Scorebrand to donate a bell, but in a rude and violent manner refused to do so until compelled by his employees to do so, and then only without paying his employees for the work done, all of which was untrue."

The film portrays *a* Franz Weeren[6] in behavior toward Dr. von Scorebrand which a jury might conclude was rude, arrogant and unfeeling. It shows him refuse to donate the bell. While this behavior is redeemed through the intervention of the Eisenwerk workmen and the saintly character of Dr. von Scorebrand, the Franz Weeren of the film is not a wholly attractive character. The testimony of the agents of defendant who were charged with the

---

plaintiff had not established an invasion of plaintiff's right of privacy."

[6] It should be noted that one of the prime issues in this case is whether or not the Franz Weeren of the TV film and plaintiff are one and the same or whether persons viewing the film would be likely to think they were.

responsibility for determining what films were to be telecast was that defendant at no time attempted to determine whether or not the film portrayed plaintiff falsely.

In *Curtis Publishing Co.* v. *Butts,* 388 US 130 (87 S Ct 1975, 18 L ed 2d 1094), decided June 12, 1967, Justice Harlan, in an opinion in which he was joined by Justices Clark, Stewart and Fortas, observed (pp 151, 152):

"The law of libel has, of course, changed substantially since the early days of the Republic, and this change is 'the direct consequence of the friction between it * * * and the highly cherished right of free speech.' *State of New Jersey* v. *Browne,* 86 NJ Super 217, 228, (206 A2d 591, 597). The emphasis has shifted from criminal to civil remedies, from the protection of absolute social values to the safeguarding of valid personal interests. Truth has become an absolute defense in almost all cases, and privileges designed to foster free communication are almost universally recognized. But the basic theory of libel has not changed, and words defamatory of another, are still placed 'in the same class with the use of explosives or the keeping of dangerous animals.' Prosser, The Law of Torts (3d ed), § 108, at p 792. Thus some antithesis between freedom of speech and press and libel actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy."

In a separate opinion, Chief Justice Warren wrote (p 170):

"Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers."

There was testimony upon the trial from which the jury might conclude that, due to the publication

of the TV film by defendant with knowledge that the film was false or in reckless disregard of whether it was false or not, the reputation of the plaintiff had been harmed so as to lower him in the esteem of the community and so as to deter third persons from associating or dealing with him.

### IV. DID THE DEFENDANT ENJOY A QUALIFIED PRIVILEGE IN TELEVISING THE FILM?

Both the trial court and the Court of Appeals held the defendant enjoyed a qualified privilege in televising "A Bell for Okinawa." The trial court found the film to be a matter of public interest and, so, held that the defendant was not required to determine the truthfulness of it, but merely to believe it to be true and publish it in good faith. The availability of privilege in libel actions is tested by the occasion and is to be determined by the court, but each occasion must be viewed in the light of its own facts. The privilege to disseminate current, topical, immediate news of public interest, or about official or public figures, is one thing. The privilege in connection with past events of possible current interest but which do not have to be transmitted to the public in a matter of hours is quite another. *Curtis Publishing Co.* v. *Butts, supra.* If the privilege is one of a limited or qualified nature, it may be lost through improper conduct. The test for a public figure, as stated by Justice Harlan, is (p 155):

"A 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

Newspaper articles appeared in 1953 when the bell was cast and given. The event was described in an article by Bruce Bliven, Jr., in a German Lutheran publication called "Christ Und Welt," in April, 1955, and the Reader's Digest story in August of 1955. Consequently, the occasion of the giving of the bell for Okinawa and plaintiff's connection therewith, if any, had entered the area of public interest. Photographs taken and published at the time remain extant. The newspaper and periodical articles describing the event can be procured from libraries or other record depositories. All of this material is in the public domain. To the extent that the film depiction of these matters was merely a reiteration by another medium of communication of what had already been published, it was privileged. Nevertheless, as Justice Talbot Smith pointed out in *Lawrence* v. *Fox* (1959), 357 Mich 134, 144, qualified privilege raises two questions:

"In short, at this point 2 questions are presented. The first is whether or not the occasion upon which the words were spoken was a privileged occasion. This determination is for the court and the burden of proof is upon the defendant asserting the privilege. If, however, the privilege is qualified, a further question remains, whether or not the privilege of the occasion was abused. Here the problem is one for the jury, under proper instructions, and with respect to it the plaintiff carries the burden of proof. 'The question whether the occasion is such as to rebut the inference of malice if the communication be bona fide is one of law for the court; but whether *bona fides* exist is one of fact for the jury.' *Timmis* v. *Bennett*, 352 Mich 355, 367, quoting *Bacon* v. *Michigan Central R. Company*, 66 Mich 166, 173."

Plaintiff established notice to defendant after the first telecast. Plaintiff claims the film deviates falsely from previous accounts. The actor who

depicts the Franz Weeren of the film may or may not faithfully and truly depict the character, features and behavior of plaintiff. Consequently, even though the defendant enjoyed a qualified privilege, there were still many questions to be considered by the jury.

"The fact, then, that it is determined that the occasion is conditionally privileged does not mean that the publisher (whether newspaper or other) has carte blanche to deal recklessly with the most jealously guarded possession of a public official, or, indeed, of any citizen, his good reputation. Yet the conditional privilege does afford the publisher a degree of protection. He is not liable for absolute truth, it being required only, as we held in *Powers* v. *Vaughan,* 312 Mich 297, 305, quoting *McAllister* v. *Detroit Free Press,* 76 Mich 338, 356 (15 Am St Rep 318), that the statement made be 'honestly believed to be true, and published in good faith.' See, also, *Howard* v. *Dickie,* 120 Mich 238, 241; 15 MLP, Libel and Slander, § 21." *Lawrence* v. *Fox, supra,* pp 142, 143.

Since none of the material was "hot" news that needed to be reported immediately, and since it is claimed the previously published material had been falsified in the film version so as to be defamatory of the plaintiff, I would apply the test set forth by the United States Supreme Court in *Curtis Publishing Co., supra,* and leave the matter for determination by a jury.

### V. WAS THERE AN INVASION OF RIGHT OF PRIVACY?

Plaintiff's claimed right of privacy poses the most difficult question but, once again, it is a question of fact for determination by a jury. The right of privacy does exist in Michigan. *Pallas* v. *Crowley,*

*Milner & Company* (1948), 322 Mich 411. It was examined by the Michigan Supreme Court in *Atkinson* v. *John E. Doherty & Co.* (1899), 121 Mich 372 (46 LRA 219, 80 Am St Rep 507). In that case it was held that a widow could not assert a suit for an injunction to prevent the use of the name of her deceased husband and a purported picture of him for a cigar and cigar label. It was concluded that the right, if it did exist, did not survive to the widow.

The right can be inferred in the early Michigan case of *Demay* v. *Roberts* (1881), 46 Mich 160 (41 Am Rep 154). In *Pallas,* this Court refused to follow the reservations as to the right expressed in *Atkinson.* *Pallas* involved a claimed unauthorized use by defendant of plaintiff's photograph. The Court said (pp 416, 417):

"The general rule (to which, of course, there are exceptions) is stated thus in the American Law Institute's 4 Restatement, Torts, § 867, p 398:

" 'A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others *or his likeness exhibited to the public* is liable to the other.'

"Doubtless the question whether the unauthorized publication of a person's photographic likeness 'unreasonably and seriously' interferes with such person's right of privacy involves an issue of fact which cannot be determined on hearing a motion to dismiss, as was done in the case at bar. We conclude that there are circumstances under which one may have a right of privacy in a photographic likeness, which may give rise to an action for damages for the unauthorized publication thereof. In so holding, we do not overlook *Atkinson* v. *John E. Doherty & Co.,* 121 Mich 372 (46 LRA 219, 80 Am St Rep 507), but decline to follow the same to the extent that it is inconsistent with the conclusion reached herein."

Prosser, Interstate Publication, 51 Mich L Rev 959, 990, describes the right of privacy as follows:

"Notwithstanding all this, the boundaries of the tort are still anything but well defined. It appears in reality to be a complex of four more or less related wrongs. One, which has the clearest recognition, is the appropriation of the values of a name, picture or personality. A second consists of intrusion upon the plaintiff's solitude or seclusion, as by invading his room, or tapping his telephone wires. The third consists of giving unjustifiable and embarrassing publicity to present or past facts out of the plaintiff's life, and is apparently closely related to the intentional infliction of mental suffering. The fourth, which has made a rather amorphous appearance in half a dozen cases, involves putting the plaintiff in a false but not necessarily defamatory position in the public eye, as by attributing to him views that he does not hold, or conduct with which he cannot fairly be charged."

Here the claimed invasions of privacy consist of "the appropriation  *   *   *  of a name, picture or personality  *   *   *  giving unjustifiable and embarrassing publicity to  *   *   *  past facts out of the plaintiff's life, and  *   *   *  attributing to him *.  *   *  conduct with which he cannot fairly be charged." *Prosser, supra.*

These are questions for a jury to determine. The proofs upon trial will of necessity include a viewing of the telecast. The language of an actor, it should be noted, is much more than words. See *Gadde* v. *Michigan Consolidated Gas Co.,* 377 Mich 117, 127, text and footnote 4 *re* nonverbal communication. It is the *way* in which he speaks, the *way* in which he moves about, the *manner* in which he smiles or frowns, that tells the story. If plaintiff has been portrayed as a villain, or whatever the portrayal,

a jury is the proper fact-finder to consider and assess that portrayal in its entirety.

## VI. In Summary

Whether plaintiff's claims have merit, they are entitled to be tested under the existing law as to libel and as to the right of privacy. I agree that the partially completed trial should be considered in connection with the motion for summary judgment. I disagree that the film is nondefamatory as a matter of law. I would treat the complaint as a two-count complaint, (1) in libel and (2) invasion of privacy. I would remand for a trial without costs, costs to abide the final result.

T. M. Kavanagh, J., concurred with Adams, J.

Brennan, J. (*dissenting*). This case comes to us as a result of a judgment rendered by the trial court on motion for summary judgment pursuant to GCR 1963, 117. GCR 1963, 117.2(3) provides that a motion for summary judgment may be made on the ground "that except as to the amount of damages there is no genuine issue as to any material fact, and the moving party is therefore entitled to judgment as a matter of law." GCR 1963, 117.3 provides, among other things, that "Judgment shall be rendered forthwith if * * * the affidavits or other proof show that there is no genuine issue of fact."

The first matter which we consider in connection with this ruling is whether the affidavit supporting the motion for summary judgment is sufficient. GCR 1963, 117.3 says that a motion based upon subrule 117.2(3) shall be supported by affidavits. GCR 1963, 117.3 further says that such affidavits shall be governed by the provisions of subrules 116.4, 116.5, and 116.6. GCR 1963, 116.4 requires a supporting affidavit to be made on personal knowl-

edge and to set forth with particularity such facts as would be admissible in evidence to establish or deny the allegation in the pleadings. Such affidavits should show affirmatively that the affiant if sworn as a witness can testify competently to the facts contained therein. The affidavit in the instant case supporting the motion for summary judgment is filed by Buell Doelle, the attorney for the defendant. It does not set forth with particularity facts which would be admissible in evidence to establish or deny the grounds stated in the motion nor does it show affirmatively that Mr. Doelle, if sworn as a witness, could testify competently to the facts contained therein. Plaintiff's answer to the motion was likewise supported only by the affidavit of his counsel, and neither party has raised any issue in this appeal as to the sufficiency of the affidavits.

GCR 1963, 117.3 says that such affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties, shall be considered by the court at the hearing on the motion. The purpose of the affidavits required by GCR 1963, 116.4 is to present to the court the nature of the evidence that would be brought out at trial in order to demonstrate whether there are genuine issues of fact to be tried. Where the pleadings, depositions, admissions, and documentary evidence then on file in the action are sufficient to satisfy the trial judge that there is no genuine issue as to any material fact, the moving party ought not to be required to comply strictly with the requirements of GCR 1963, 116.4 in the affidavit which supports his motion.

The second question presented is this: On what was the motion for summary judgment based? That is to say, what were the pleadings, depositions, admissions, and documentary evidence which the trial judge could consider in arriving at his decision on

the motion for summary judgment? There is no quarrel as to what pleadings were then before the court. But in this case, there was an abortive trial to a jury. It began on Tuesday, June 11, 1963, and ended on Thursday, July 20, 1963, when the attorney for the plaintiff made a motion for mistrial which was granted by the court. In his motion for entry of, summary judgment, defendant says as follows: "that the pleadings heretofore filed in the above action, *as well as the earlier and nearly completed trial of the cause on the merits before this court and a jury,* disclose that there is no genuine issue as to any material fact." Both the trial judge in his opinion on the motion for summary judgment and the Court of Appeals in the opinion reported in 2 Mich App 74 make reference to the partially completed trial. Substantial excerpts from the partially completed trial are contained in the record presented on appeal in this Court, including excerpts from the testimony of Robert A. Benyi, an employee of the defendant, Henry C. Rogers, an employee of the defendant, Joanne Sirgany, a friend of the plaintiff, James Shiavone, an employee of the defendant, Helen Ring, a friend of the plaintiff, and Mrs. Franz Weeren, the wife of the plaintiff. In addition thereto, the record on appeal in this case contains the transcript of over a hundred pages of testimony on direct and cross-examination by Franz J. Weeren, the plaintiff in this case. Further, the record contains one exhibit of the defendant and two exhibits of the plaintiff. As will be seen later in this opinion both the trial court and the appellate court made reference to many things contained in the testimony and observable from the exhibits. It should be stated that in addition to the exhibits printed in the record in this case, this Court has viewed the film which is the focal point of the controversy between parties. The film was viewed also by both

the trial court and the appellate court. This partially completed trial contains *"admissions and documentary evidence then on file in the action or submitted by the parties"* which were properly considered by the trial court in deciding whether there are any genuine issues of disputed fact.

We can see no distinction between admissions made by the plaintiff in a pretrial discovery deposition and admissions made by him from the *witness* stand in the presence of the court and the jury. If his admissions disclose that there is no genuine issue as to any material fact, in either case, the court ought to be allowed to act upon that disclosure. We see no distinction between exhibits attached to an affidavit given pursuant to GCR 1963, 116.4 and exhibits which have been marked and filed and identified and admitted to evidence in the process of a partially completed trial. All of these things must clearly be considered as having been submitted by the parties, in compliance with the court rule. Neither plaintiff's counsel nor defendant's counsel urged that this Court should close its eyes to the matters which were contained in the record in this case and confine itself to a consideration of the pleadings and the abbreviated affidavits in support of and in opposition to the motion, or pick and choose among the items of documentary evidence that were submitted to the trial court and considered by it in ruling on the motion. We hold, therefore, that the phrase in GCR 1963, 117.3, *"depositions, admissions, and documentary evidence then filed in the action or submitted by the parties,"* may include testimony given in a partially completed trial before the same judge who hears the motion for summary judgment, and these things may be considered by the trial judge where the parties treat the partially completed trial as supporting their respective positions on the motion.

Having thus assumed the task of examining the record in this case with particularity, we must now tell the story of Franz J. Weeren against the Evening News Association as it can be gleaned from the words of Mr. Weeren himself and the uncontroverted exhibits, documents, and pleadings in the cause. Franz J. Weeren was 41 years of age in June of 1963 when he took the stand in the trial of this case. He was born in Berlin, Germany. His father's name was Doctor Fritz Weeren; his grandfather was called Franz Weeren. His grandfather had established an ironworks in Berlin in October, 1887. Upon the grandfather's death in 1936, plaintiff's father, Doctor Fritz Weeren, became the owner of the family business, known as the Eisenwerks Franz Weeren, which manufactured iron bells. Plaintiff served in the German army during the Second World War, and after the war, upon completing his education, went to work for his father in the ironworks as its general manager. His father, Doctor Fritz Weeren, was still active in the business, and both plaintiff and his father lived in a home built on the premises of the ironworks. In December of 1952, a workman in the foundry brought to the plaintiff a copy of a news article which had appeared in the Morgenpost on the 7th of December, 1952. The newspaper article told the story of one, Dr. von Scorebrand, who had come from a leper colony in Okinawa and was in Berlin looking for a bell. Plaintiff took the article to his father, discussed the matter with his father, and one of them directed a Mr. Eising, their office clerk, to call Dr. von Scorebrand regarding his efforts to obtain a bell. Dr. von Scorebrand came to the plant with a newspaper reporter 2 or 3 days later. Both Mr. Weeren and his father discussed with Dr. von Scorebrand the possibility of giving him a bell. Dr. von Scorebrand

was a guest in the Weeren home and there were numerous conversations regarding the bell had between them. Dr. von Scorebrand was offered, free of any charge, any bell he selected to choose from the factory ground. In due course of time, a bell weighing approximately 2,700 or 2,800 pounds was constructed at the iron works. There was some controversy at the trial as to whether the employees who worked on the bell were paid for their efforts. It must be assumed on motion for summary judgment and on this appeal that they were paid, as claimed by plaintiff, Mr. Weeren.

After the bell was cast, it was donated to Dr. von Scorebrand in a ceremony which took place around the airlift memorial in Berlin. Present were the acting mayor of Berlin, Protestant and Catholic clergymen and a Rabbi. The plaintiff was present, but did not participate in the ceremony, and his father, who was ill, was not present. Newspaper men and representatives of the wire services were present at this ceremony, and newsmen had been present at a previous test ringing of the bell, which was conducted at the factory itself. Newspaper articles regarding the donation of the bell to the leper colony by the Weeren Iron Works, appeared at the time. Some three years later, there appeared in a German Lutheran publication called *Christ Und Welt* an article by a man named Bruce Bliven, Jr. This article purported to tell the story of the donation of the bell by the ironworks to the leper colony. The article appeared on the 7th of April, 1955, and it was marked and received as an exhibit at the trial.

Plaintiff testified that when the article was published he discussed it with his father and his mother, that they agreed there were inaccuracies in the Bliven story, but that it was not malicious. Plain-

tiff testified that there was nothing defaming in the
*Christ Und Welt* article, although he stated that the
story was inaccurate in that it portrayed the work-
ers offering to volunteer their work free of cost,
which was not so. He further indicated that the
story was inaccurate because it gave the impression
that the people of Berlin wanted to donate the bell
out of thanksgiving for the American airlift. He
said further that the particular inaccuracy with
reference to the workers offering their wages did
not bother him. He stated that a truck driver, who
had transported the bell, was inaccurately called
Max in the article when his real name was Karl. He
testified that there was another inaccuracy in the
article in that it had stated that the bell was smeared
with a dirty substance to make it appear as though
it were an old and worthless bell. And though he
conceded that a grease-like covering was placed on
the bell, plaintiff testified that this was a protective
measure and was not done for the purpose of making
the bell appear old or worthless. Weeren described
this spraying or smearing inaccuracy as "kind of
funny." Another error in the *Christ Und Welt*
article which Mr. Weeren described in his cross-
examination, was that it described his father as Dr.
Franz Weeren, when in fact his father's name was
Dr. Fritz Weeren. Upon later viewing the exhibit,
Mr. Weeren conceded that the *Christ Und Welt*
article did not describe his father as Dr. Franz
Weeren but merely as Dr. Weeren. The plaintiff
described the *Christ Und Welt* article from the wit-
ness stand as being a very flowery and nice story.
The plaintiff reiterated that the *Christ Und Welt*
article was not malicious, and that neither he nor
his father took any action to correct the inaccuracies
they had seen in it.

In August of 1955, the Readers Digest published a story entitled "A Bell for Okinawa," which was condensed from the *Christ Und Welt* article by Bruce Bliven, Jr. Notice was given in the Readers Digest article, giving copyright credit to *Christ Und Welt* of April 7, 1955. Mr. Weeren testified that he did not make a word-for-word comparison between the Readers Digest article and the *Christ Und Welt* article since the former was based upon the latter. Mr. Weeren testified that he discussed the German edition of the Readers Digest story with his father, that they concluded that there were inaccuracies in the Readers Digest story but they were almost identical to the inaccuracies appearing in the previous *Christ Und Welt* story. The Readers Digest article was marked and received as an exhibit at the trial, and it was called to the plaintiff's attention that the Readers Digest article made reference to a Dr. Franz Weeren, whom the article described as the owner of the ironworks. When asked whether he was disturbed by this, Mr. Weeren replied that there "seems to be a slight inaccuracy here." Referring to the Readers Digest article, the plaintiff again pointed out inaccuracies, indicating that while the Readers Digest article stated that the phone call to Dr. von Scorebrand was made by Dr. Franz Weeren, owner of the iron works, the phone call was in fact made by Mr. Eising, the clerk in the office. The Readers Digest article repeated the erroneous report of an offer of free labor being made by the workmen. Plaintiff testified that the Readers Digest article inaccurately attributed to Dr. von Scorebrand the inspiration to name the bell the *Zuversicht,* that is, the Confidence Bell. The plaintiff testified that the naming of the bell was his own inspiration. He pointed out further that the Readers Digest article described the lettering on the bell as bas-relief when

in fact it was in Gothic lettering. The article inaccurately quoted Dr. Weeren as having said it was risky to get a bell from Berlin to Hamburg, when in fact it was not risky and no such statement had ever been made. Again, plaintiff pointed out that the truck driver was erroneously called Max instead of Karl, and the protective greasy covering put on the bell was again inaccurately reported as having been designed to make the bell appear old and worthless. Mr. Weeren reiterated that no action was taken by him or by his father with reference to the Readers Digest article, or the *Christ Und Welt* article, and for the third time stated that there was nothing malicious in the articles.

On April 20, 1958, the defendant, Evening News Association, through its television station WWJ-TV, Channel 4, in Detroit, Michigan, televised an hourlong dramatic presentation entitled "A Bell for Okinawa" on a television program called the Readers Digest Hour. The film was made by Bernard L. Schubert, Inc., and was leased to the defendant for two showings by Telestar Films, Inc. By this time, the plaintiff, Franz J. Weeren, was living in Oak Park, Michigan, a suburb of Detroit. In his amended complaint, the plaintiff stated that the film as produced and telecast by the defendant used plaintiff's name and identified him with the ironworks and falsely characterized and portrayed him by name as an arrogant unfeeling person, and as possessing a character universally associated with the Hitler Nazi party. He further alleged that the film as telecast asserted that plaintiff was approached by Dr. von Scorebrand to donate a bell, but in a rude and violent manner he had refused to grant the request until compelled by his employees to do so, and then only without paying his employees for the work done, all of which was untrue. He further

alleged that the film as telecast implied and asserted that the plaintiff was an experienced smuggler, and conspired with others to smuggle the bell to Hamburg in violation of international treaties and agreements, all of which was untrue. Plaintiff further stated in his amended complaint, that he immediately, through his attorneys, caused a letter to be sent to the defendant requesting that defendant cease and desist from further distribution and telecast of said film, and advising the defendant that said film was false and defamatory and an invasion of his right to privacy. The original letter is included as an exhibit in the record of this case, and it states as follows:

"ALLEN, HAASS AND SELANDER

Attorneys and Counselors
Dime Building
Detroit 26

May 7, 1958.

"Evening News Association,
615 Lafayette Building,
Detroit 26, Michigan.

"*Gentlemen:*

"The writer and Jack Moskowitz, attorney, at law; of Hazel Park, Michigan, have been retained by Franz J. Weeren in connection with your recent television broadcast 'A Bell for Okinawa' on station WWJ-TV. The characterization of Mr. Weeren and representation of his actions and conduct are regarded as false, defamatory and an invasion of his right of privacy. Mr. Weeren and his family have already suffered severe damages as a result of the telecast for which you and others will be required to respond.

"The purpose of this letter is to inform you of Mr. Weeren's position and to request that you refrain from any retelecast or other action which

would further damage Mr. Weeren, his family and business.

> "Yours very truly,
> "Allen, Haass and Selander
> "/s/ James C. Allen

"JCA/eab"

Plaintiff further alleged in his amended complaint, that notwithstanding receipt by defendant of this letter, defendant did again recklessly and without the knowledge and consent of the plaintiff telecast said film on or about September 2, 1958.

Defendant concedes receipt of the letter and concedes that there was a further telecast of the film on or about September 2, 1958. The trial judge who viewed the film on two occasions has this to say about it:

> "First, it is my finding that the film, 'A Bell for Okinawa,' is not defamatory as a matter of law of any of the characters it depicts. About this conclusion, in my opinion, the minds of reasonable persons would not disagree. I should remark here that in the published articles and the film there is an obvious confusion of names occurring, probably in the translation from German to English. Plaintiff's father is Dr. Fritz Weeren. His grandfather, founder, was Franz Weeren. The foundry is known as the Franz Weeren Iron Works or Eisenwerk Franz Weeren. Plaintiff was never known as Dr. Franz Weeren. He entered the United States in September, 1956, under the name of Franz J. Weeren.

"Consideration of the film if the pleading of the plaintiff is to be followed suggests that the public will asume that he is the portly, middle-aged German portrayed as Dr. Franz Weeren, rather than the slim, youthful-looking person who was shown to this court in pictures exhibited at the trial, but there is nothing defamatory about portliness or middle-aged which the film portrayal of Dr. Franz Weeren depicted. There was certainly nothing to suggest

Nazi characteristics. He was both a person and an ancestor of whom one could be proud.

"This court, therefore, is of the opinion, and it so finds that the criticism of the film as pleaded and voiced by plaintiff's counsel at the time of oral argument is of a hypercritical, supersensitive nature and not such as would be remotely objectionable to an ordinary reasonable person."

This Court has viewed the film and agrees with the trial court's description of it.

No one could doubt that a television broadcaster is not the insurer of the truth of every quasi-historical dramatic presentation it broadcasts, and there is clearly a privilege extended a television broadcaster which will shield it from civil liability for libel in the absence of a positive showing of both falsity and malice in the publication.

The only possible question of fact we can see on this issue of libel is whether the Evening News Association, having received the letter described above, as exhibit 2, was obligated to investigate the truth of the representations made in the film before rebroadcasting it. If the letter of May 7, 1958, sought to accomplish that purpose, it falls short of the mark. The letter does not even indicate to the Evening News Association that the Mr. Weeren, whom the lawyers represented, was or claimed to be in any way connected with the Eisenwerk Franz Weeren described in the film. There are no details in the letter indicating in what particulars the film is alleged to be false or defamatory. All the defendant could possibly have been expected to do under the circumstances was to view the film again and arrive at some reasonable conclusion as to whether it was false and defamatory on its face. This they did, and apparently arrived at the same conclusion as the trial judge that the film would not be remotely objectionable to an ordinary reasonable person.

And finally, we must consider whether the facts here present a case in which a suit for civil damages should lie for invasion of the plaintiff's privacy. Concluding as we do, that the film was not defamatory *per se* and that the inaccuracies contained therein were those which could be legitimately countenanced as part of the artistic license involved in the presentation of a dramatic work, does plaintiff have some property right in this event in which he participated, or some property right in his own participation in the event which precludes its broadcast for profit and entertainment without his permission? Without discussing the legal precedents on this point, the instant case can be clearly distinguished from those cases in which recovery has been permitted for invasion of the right of privacy.

The Franz Weeren Iron Works was in the business of making bells. It donated a bell to a leper colony in Okinawa, and it obtained the benefit of considerable publicity in connection with that act of charity. Public relations and institutional publicity for business establishments are as common and accepted in our day as any other fact of modern life. Neither a company nor the owner of a company nor the son of an owner of a company ought to be permitted to complain if publicity sought and obtained creates more than a ripple on the waters of public notice. From the minute a newspaper man walked in the front door of the ironworks in the company of Dr. von Scorebrand and the story of the donation of the bell voluntarily released to him, the entire story and the participation of the plaintiff in it became part of the public domain. Repetition of the story in other news media, condensations of it, retellings of it, dramatizations of it were the expected and desired result, and it ill behooves the

plaintiff to demand seclusion and anonymity at this late date.

The judgment of the trial court should be affirmed, with costs to defendant.

DETHMERS, C. J., and O'HARA, J., concurred with BRENNAN, J.

KELLY, J., did not sit.